597 So.2d 990 (1992)
STATE of Louisiana
v.
Robert M. HAMMONS.
No. 90-K-1920.
Supreme Court of Louisiana.
April 20, 1992.
*991 Robert Stephen Glass, Glass & Reed, New Orleans, for defendant-applicant.
Richard Phillip Ieyoub, Atty. Gen., Walter Philip Reed, Dist. Atty., William R. Campbell, Jr., David J. Knight, Asst. Dist. Attys., for plaintiff-respondent.
LEMMON, Justice.
The issue in this case is whether defendant is entitled to a new trial based on newly discovered evidence. We hold that the trial judge erred in denying defendant's motion for new trial.
Facts
On July 23, 1984, a man entered the Lakewood Pharmacy in Slidell at about 4:30 p.m. and asked the pharmacist about a prescription ordered by a dentist for him by telephone. The pharmacist replied that he had not received the order, and the man stated that he would return. Shortly before the 7:00 p.m. closing time, the man returned to the store, pulled a handgun from his jacket, and ordered the pharmacist to give him dilaudid, "speed" and "downers," as well as a syringe and a needle. The robber also instructed a customer and two employees to go to the back of the store, where he required the pharmacist to bind them with adhesive tape. The pharmacist then gave the robber a quantity of controlled substances, including dilaudid. When the pharmacist could not open the cash register, the robber took a new roll of adhesive tape from the shelf, bound the pharmacist and left the store. After his hands were free, the pharmacist used a pen to pick up the adhesive tape casing that the robber had handled with bare hands and preserved it for the police.
The police arrived on the scene shortly after 7:00 p.m. The pharmacist gave the casing to a police officer who handled it with a pen and placed it in an evidence bag. Because the robber had specifically demanded dilaudid, the police asked the pharmacist to review the prescriptions for that drug which had been filled that day. The only dilaudid prescription found by the pharmacist was a legitimate prescription issued to defendant's father, Frank Hammons, who lived in Chickasaw, Alabama. The Slidell police contacted the authorities at nearby Pritchard, Alabama, and obtained a nine-year-old photograph of defendant. Two days after the robbery, several of the witnesses viewed an array of photographs and identified defendant as the robber from the nine-year old photograph. Defendant and his father were both arrested and charged with armed robbery.
At the trial a Slidell doctor testified that he had examined defendant's father at about 3:00 p.m. on the day of the robbery and prescribed fifty tablets of dilaudid for pain associated with an injury he had sustained several years earlier. The pharmacist testified that he had filled the prescription for defendant's father between 3:00 p.m. and 3:30 p.m.
An employee of a grocery store next to the pharmacy testified that he had seen a man wearing a light blue suit, white tennis shoes, and sunglasses, with "slicked back" dark hair, a mustache and a full beard, pacing outside the pharmacy after 3:00 p.m. The composite sketch drawn from his description showed a closely-cropped beard. *992 At trial he identified defendant as the person outside the drug store.
The pharmacist described the robber as wearing a light blue suit and dark glasses, and having long hair combed straight back and an "extremely neat" and trim beard. At trial the pharmacist identified defendant as the robber.
One drug store employee testified that defendant's father came into the store earlier with a prescription for dilaudid and that the robber came into the store about 6:00 p.m. to inquire about the closing time, returning shortly before 7:00 p.m. to commit the robbery. She described the robber as wearing a light blue sport coat and dark glasses, and having "blondish-brown" hair, a mustache and a "well-groomed" beard. She picked defendant out of the photographic lineup several days after the robbery, but selected the wrong picture from the array at trial. Nevertheless, she definitely identified defendant at trial as the robber.
A second pharmacy employee testified that the robber came into the store several times before the robbery. She described the robber as wearing a light blue sport coat and having blond hair, a mustache and a short, clean-cut blond beard. She selected defendant's picture from a photographic array two days after the robbery and positively identified him at trial as the robber.
The customer described the robber as wearing dark glasses and having light brown hair, but did not believe he had a beard. She picked defendant out of the photographic array several days after the robbery and positively identified him at trial as the robber.
Thus, the pharmacist, one of the pharmacy employees, and the grocery store employee immediately after the robbery provided composite sketches, all of which depicted the person they saw as having a closely-cropped beard. One of the other eyewitnesses testified at trial that the robber had a closely-cropped beard, and the pharmacy customer stated that the robber had no beard at all. A photograph of defendant, taken by the police eight days after the robbery, showed defendant with a full, dark, long and bushy beard, and that photograph, according to an Alabama police officer, was the exact likeness of defendant on the date of the robbery.
The fingerprint taken from the adhesive tape casing handled by the robber did not match defendant's prints. However, the detective testified that the person who gave the casing to him did not handle it with a pen.
Defendant testified that on the day of the robbery he and his father were in Slidell to inspect concrete pumps for their concrete pumping service. After they completed their business, defendant's father was in pain and needed medication that he had forgotten to bring with him. About 4:00 p.m., the two went to a medical center near the concrete company, where a doctor examined defendant's father and prescribed dilaudid. Defendant and his father went to the Lakewood Pharmacy, where the father went into the store while defendant used the phone outside to notify his mother that they were coming home instead of visiting relatives as planned. After the prescription was filled, they headed back to Chickasaw, arriving at the father's home between 6:00 p.m. and 6:30 p.m. The time was verified by five relatives, who indicated they were watching the 6:00 p.m. news on television when the two men arrived. Defendant left his parents' home around 6:30 p.m. and drove to his own home, ten minutes away. He left shortly thereafter to go to his shop, but stopped at the Tavern, where five witnesses (not related to defendant) saw him between 7:00 p.m. and 8:30 p.m. Defendant left the Tavern with a friend when his wife notified him that the police department had called him (as the next person on the list of authorized tow truck operators) to tow away a disabled vehicle. Defendant went home to get his tow truck and then drove the truck to the scene of the accident. A police officer verified that defendant arrived on the accident scene in his tow truck at 9:12 p.m. and towed away one of the vehicles.
Testimony by an Alabama police officer established that the driving time from Slidell to the Pritchard Police Department *993 (west of Chickasaw) is two hours and eleven minutes at fifty-five miles per hour and one hour and forty-seven minutes at sixty-five miles per hour. Defendant's home, where his tow truck was kept, was on the other side of Pritchard from Slidell.
The jury returned a verdict of guilty of armed robbery against both defendant and his father. Defendant was sentenced to forty years at hard labor without benefit of parole, probation or suspension of sentence.[1]
Thereafter, defendant filed a motion for new trial based on newly discovered evidence. Defendant attempted to show by the evidence that Gary Stanford, after the trial, admitted robbing the Lakewood Pharmacy of dilaudid with Frank Burzik, who bore a striking resemblance to defendant.
At the hearing on the motion, a private investigator testified that he received a tip that a person named Jimmy Scholes had stated two Alabama men were wrongly convicted of the Lakeside Pharmacy robbery. The investigator contacted Scholes who told him that Stanford, while transacting a dilaudid sale with Scholes, Steve Brown and a woman named Bonnie several weeks after the robbery, said he had obtained the dilaudid by robbing a Slidell pharmacy. Stanford further told Scholes and the group that he had "nothing to worry about" because two innocent men from Alabama had been arrested for the robbery.
The investigator located Brown, who agreed to assist in the investigation by recording conversations with Stanford. In the first of several audiotaped conversations, Stanford made the following statements:
... Sweet, sweet score. We got a truck load of dilaudids. Shit load of dilaudids and other shit. But the best thing about the robbery was how easy it was for me and my partner because of the inside connection. This chick did a hell of a job in setting it up. But, what made it so good, the pigs busted a young dude and his old man for the robbery, and we don't have shit to worry about. Lakewood Pharmacy was a sweet score.[2]
In a later taped conversation Stanford made the following comments:
... Rip off in Slidell. I felt like I should have done it myself. But, Frank [otherwise identified as Frank Burzik] said he had the guts to do it, and I took the chance.... I knew he could handle it and he did good.
In a third recorded conversation Stanford spoke of efforts by attorney Robert Glass to obtain a new trial for the two Alabama men on the basis that fingerprints didn't match.
After these conversations were recorded, the Legislature enacted La.Rev.Stat. 14:322.1 (later declared unconstitutional) which prohibited recording conversations without the consent of all parties. The defense then sought the assistance of a federal drug enforcement agent who was exempt from the statute. The agent, who was investigating Stanford for cocaine activity and later arrested him for distribution, agreed to use Brown as a confidential informant in the drug investigation, but no additional tapes regarding the armed robbery were forthcoming.
Brown, who had several felony convictions, further testified Stanford admitted in unrecorded conversations that he participated in the robbery and that Burzik was the gunman. Brown also stated Burzik was a drug addict who "shot up drugs."
The defense introduced photographs of Burzik and Stanford which showed that Burzik bore a close resemblance to defendant. Brown testified that he mistook defendant for Burzik upon seeing defendant in court.
*994 The district judge denied defendant's motion for new trial, noting that he doubted Brown's credibility. The court of appeal remanded for a new hearing because the trial judge had used the incorrect standard for deciding the motion. 536 So.2d 598. The appellate court pointed out that under State v. Talbot, 408 So.2d 861 (La.1981), a trial judge in making such a determination should not weigh the new evidence as if he or she were a jury deciding guilt or innocence, but should ascertain whether there is new material fit for a new jury's judgment.
On remand the trial judge again denied the motion. Noting that under La.Code Crim.Proc. art. 851(3) the court must find that the newly discovered evidence would probably have produced a different verdict, the judge concluded that the evidence would not be admissible at a new trial under La.Code Evid. art. 804 B(3), because of the lack of corroborating circumstances clearly indicating the trustworthiness of the statement. Additionally observing that the new evidence, "remarkably" discovered after the trial, was "suspicious" and "incredible", the judge ruled that the new evidence was unfit for a new jury's judgment.
The court of appeal affirmed in an unpublished opinion, concluding the trial judge did not abuse his discretion in denying the new trial motion. 565 So.2d 542.
We granted defendant's application for certiorari to determine the correctness of the rulings of the courts below. 575 So.2d 382.
Motion for New Trial
La.Code Crim.Proc. art. 851 provides in part:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
. . . . .
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty....
In order to obtain a new trial based on newly discovered evidence, the defendant has the burden of showing (1) the new evidence was discovered after trial, (2) the failure to discover the evidence at the time of the trial was not caused by lack of diligence, (3) the evidence is material to the issues at trial, and (4) the evidence is of such a nature that it would probably have produced a different verdict. State v. Knapper, 555 So.2d 1335 (La.1990); State v. Prudholm, 446 So.2d 729 (La.1984); State v. Talbot, 408 So.2d 861 (La.1980); 8A James W. Moore et al., Moore's Federal Practice ¶ 33.03[1] (2d ed. 1991); 3 Charles A. Wright, Federal Practice and Procedure § 557 (2d ed. 1982); IV Wharton's Criminal Procedure § 599 (Charles E. Torcia ed., 1976). The trial court has much discretion in ruling on a motion for new trial. However, if the trial court exercises this discretion arbitrarily and the judgment is unjust, the reviewing court should set aside the judgment and order a new trial. State v. Knapper, 555 So.2d 1335 (La. 1990); State v. Talbot, 408 So.2d 861 (La. 1980).[3]
*995 In the present case defendant hired a new attorney after the trial. A bail bondsman told the attorney's investigator that Jimmy Scholes had made the statement that two Alabama men were wrongly convicted of the Slidell pharmacy robbery. Scholes led the investigator to Steve Brown, who furnished the pertinent statements and taped the conversations with Stanford concerning Stanford's and Burzik's involvement in the robbery.
It is unlikely that these witnesses could have been found or that the evidence could have been discovered at the time of trial with the exercise of due diligence. It was only after defendant was convicted that the fortuitous tip about a wrongful conviction could be forthcoming. Moreover, the trial judge did not find that the evidence failed to qualify as newly discovered or that the defense failed to exercise due diligence in discovering the evidence. We conclude that the evidence was newly discovered after the trial notwithstanding defendant's exercise of due diligence.
As to materiality, a confession by a third party to committing the crime of which defendant has been convicted is clearly material to a genuine issue in this case, since the only issue was the identity of the robber.
As to the probability that the new evidence would have produced a different verdict, the trial judge reasoned that the new evidence would not have produced a different verdict because the evidence was not admissible. The admissibility of the newly discovered evidence is therefore one of the critical issues as to defendant's entitlement to a new trial.
Admissibility of the Evidence
The newly discovered evidence in this case involves admissions against penal interest, the admissibility of which is controlled by La.Code Evid. art. 804. This article provides certain exceptions, in cases in which the declarant is unavailable, to the general rule against admissibility of hearsay statements as follows:
A. Definition of unavailability. Except as otherwise provided by this Code, a declarant is "unavailable as a witness" when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court. This includes situations in which the declarant:
(1) Is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement;
. . . . .
B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
. . . . .
(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. (emphasis added).
Louisiana's rule as to statements against penal interest is closely patterned after Fed.R.Evid. 804.[4] The history of the federal rule is therefore pertinent.
At common law, only statements against pecuniary or proprietary interest were originally admissible as an exception to the hearsay rule. Statements against penal interest were not accepted because of the fear that such statements, particularly when offered to exculpate the accused, would be fabricated by the witness testifying *996 to his knowledge of the statement or by someone who would then make himself unavailable. 5 John H. Wigmore, Evidence in Trials at Common Law § 1476-77 (Chadbourn rev., 1974); 4 David W. Louisell & Christopher B. Mueller, Federal Evidence § 489 (1980); 2 Stephen A. Saltzburg & Michael M. Martin, Federal Rules of Evidence Manual 401 (5th ed. 1990). Scholars and dissenting jurists persistently criticized the exclusion of such evidence. Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913) (Holmes, J., dissenting); Wigmore, supra, § 1476-77. Eventually courts began to admit declarations against penal interest. Louisell & Mueller, supra, § 489; McCormick on Evidence § 278 (Edward W. Cleary ed., 3rd ed 1984); see Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).
Prompted by these rulings, Congress incorporated in the federal rules an exclusion from the hearsay rule for statements against penal interest. However, because of the traditional suspect nature of admitting statements by a third-party that exculpate an accused, the federal rules specifically prohibited admission of these statements unless the declarant is unavailable and corroborating circumstances clearly indicate the trustworthiness of the declaration. Fed.R.Evid. art. 804(b)(3); McCormick on Evidence, supra, § 278; Louisell & Mueller, supra, § 489.
Statements against penal interest were first recognized by this court as exceptions to the hearsay rule in State v. Gilmore, 332 So.2d 789 (La.1976). In Gilmore the defendant presented a witness' testimony that another man had confessed to committing the crime for which the defendant was charged. The declarant died after making the statement and was unavailable for trial. Other evidence established that the declarant had been in a struggle with the victim moments before the victim was shot and had also confessed the shooting to others. This court held that this additional evidence indicating the statement's reliability, along with the unavailability of the declarant, made the statement admissible as an exception to the hearsay rule.
Admission of statements against interest, as a traditional exception to the hearsay rule, is based on necessity and trustworthiness. The unavailability of the declarant requirement generally establishes the need to admit his out-of-court statement. The "against interest" requirement assures some degree of trustworthiness, because a person ordinarily does not make a statement that is disadvantageous to himself without substantial reason to believe that the statement is true. Louisell & Mueller, supra, § 489.
Fed.R.Evid. 804(b)(3) requires for admissibility of a statement against interest the objective determination that "a reasonable man in his position would not have made the statement unless he believed it to be true." This standard is especially appropriate to the admission of having committed a crime. Louisell & Mueller, supra, § 489; McCormick on Evidence, supra, § 279; State v. Rushing, 464 So.2d 268 (La.1985); State v. Hudson, 361 So.2d 858 (La.1978).
When the statement is one against the declarant's penal interest, the circumstances surrounding the making of the statement may be significant in determining its trustworthiness. If a declarant admits sole responsibility for a serious crime, the statement is generally prima facie against interest so as to satisfy this requirement of the rule. Louisell & Mueller, supra, § 489. However, if the statement is clearly self-serving, as when the declarant is seeking favorable treatment for himself in return for cooperation, the statement may be deemed not against his interest and thus may fall outside the exception. Id. Likewise, when the declarant unknowingly speaks to informants or undercover agents, the statement is usually admissible under the exception. Id.; see also McCormick on Evidence, supra, § 279; Saltzburg & Martin, supra, 401.
When the statement tending to expose the declarant to criminal liability is offered to exculpate the accused, La.Code. Evid. art. 804 B(3) expressly requires corroborating circumstances indicating trustworthiness. The burden of satisfying the *997 corroboration requirement is on the accused. Louisell & Mueller, supra, § 489 (Supp.1991). That burden may be satisfied by evidence independent of the statement which tends, either directly or circumstantially, to establish a matter asserted by the statement.[5] Louisell & Mueller, supra, § 489. Circumstantial evidence of the veracity of the declarant as to the portion of the statement exonerating the accused is generally sufficient. Typical corroborating circumstances include statements against the declarant's interest to an unusual or devastating degree, or the declarant's repeating of consistent statements, or the fact that the declarant was not likely motivated to falsify for the benefit of the accused. Id. at 1160.
Applying the requirements of Article 804 B(3) to the facts of the present case, we note that Stanford asserted his privilege against testifying at the hearing on the motion for new trial. La.Code Evid. art. 804 A(1) provides that a declarant is considered unavailable when the declarant "[i]s exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement." See also State v. Adams, 550 So.2d 595 (La.1989). Thus, the declarant was clearly unavailable.[6]
Stanford's statements which form the basis of the new trial motion were clearly made under circumstances that were against Stanford's penal interest. Stanford admitted organizing and participating in the robbery of the Slidell pharmacy, acts which Stanford knew were criminal and punishable by a significant length of imprisonment. The statements were made to an informant at a time when Stanford was unaware that Brown occupied this position. Stanford did not make the statement to put himself in a bargaining position with law enforcement officials, since he was not then charged with any other crime and he knew defendant and his father had already been arrested for that crime. There was certainly no suggestion that Stanford made these admissions under motivation to benefit defendant.
These same circumstances also serve to corroborate the trustworthiness of the statements. In the midst of a deal to sell the dilaudid obtained in the robbery of the Lakewood Pharmacy, Stanford felt at liberty to discuss his participation in the robbery with an acquaintance such as Brown whom he felt would keep the information confidential, especially after someone else had been arrested for the crime. Stanford did not personally know defendant or his father and had no motivation to make a false statement for their benefit. The fact that Stanford repeated his statements concerning his participation in the robbery on several occasions, and not on a single isolated incident, further indicate their trustworthiness.
Another significant indication of the trustworthiness of the statements is the fact that some were recorded, the recording of an identified voice providing irrefutable evidence that the statements were in fact made. Furthermore, these were not jailhouse confessions reported by an inmate informant seeking to curry favor with the prison authorities. After the statements were recorded, a federal drug enforcement agent used the same informant to make a successful drug case against Stanford and Burzik. This fact is also significant because the robbery under review in this case was a drug robbery.
Additionally, there are external corroborating circumstances. The fact that Burzik, who according to Stanford's statements was the actual gunman during the robbery, was similar in appearance to the identi-kit sketches completed by the eyewitnesses *998 immediately after the robbery and to the person identified by several eyewitnesses as the robber tends to support Stanford's statements, just as a lack of similarity between the person named as the gunman by Stanford and the description given by the eyewitnesses to the robbery would have refuted Stanford's statements. The fact that the robber specifically asked for dilaudid and a syringe, combined with Brown's testimony that Burzik was a needle-using drug addict and evidence that Stanford sold dilaudid shortly after the robbery, also tend to corroborate the truthfulness of Stanford's statements. Finally, the fact that the fingerprints on the tape casing handled by the robber did not match defendant's prints provides further external corroboration for Stanford's statements.
We conclude that these circumstances, independent from Stanford's statements themselves, tend to establish matters asserted by the statements and clearly indicate the trustworthiness of the statements. The circumstances thus fulfill the corroboration requirement of Article 804 B(3). We accordingly hold that the newly discovered evidence would be admissible at a new trial.
Probability of a Different Verdict
The admissibility of the newly discovered evidence, however, does not conclude the determination of whether a new trial should be granted. The evidence must be of such a nature that if it had been introduced at trial, it would probably have changed the verdict of guilty. La.Code Crim.Proc. 851(3). We therefore review the evidence constituting the state's case, not to determine the sufficiency of the evidence, but to evaluate the effect of the newly discovered evidence. If the evidence supporting the guilty verdict contains significant contradictions and discrepancies, newly discovered evidence of relatively minor importance might be sufficient to create a reasonable doubt. State v. Talbot, 408 So.2d 861 (La.1981), citing U.S. v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).
The state's evidence linking defendant to the crime in the present case consisted solely of the testimony of four eyewitness who identified defendant as the perpetrator of the robbery.[7] There was no physical evidence whatsoever linking defendant to the crime.[8] Indeed, the only item of physical evidencea fingerprint on the adhesive tape casing handled by the barehanded robberwas the fingerprint of a person other than defendant.
The eyewitnesses described the robber immediately after the robbery, as well as at trial, as a man with a closely-cropped beard or with no beard at all. The photograph of defendant, taken by policemen only eight days after the robbery, depicted a man with a full, thick, long and bushy beard, thereby casting doubt on the reliability of the eyewitnesses' identification.[9]
The testimony of twelve witnesses, including a police officer and five unbiased persons who were not defendant's relatives, established defendant' presence in Pritchard, Alabama before, during and after the time of the robbery.[10] And even if one only credits the testimony of the Pritchard police officer that defendant was at the scene of an accident in his tow truck *999 outside of Pritchard at 9:12 p.m., that fact alone is inconsistent with defendant's committing a 7:00 p.m. robbery in Slidell, because defendant would have had to drive almost two hours from Slidell to Pritchard and then to his home north and east of Pritchard, get his tow truck, and then drive the truck to the scene of the accident by 9:12 p.m. The likelihood of this scenario is made even more remote by the fact that defendant was called to the accident because of the coincidental occurrence that his name came up next on the list of tow truck operators used by the Pritchard police to handle accidents.
Another significant factor bearing on the reliability of the original jury's verdict is the fact that the same jury also found defendant's father guilty of every essential element of the crime of armed robbery, when there was absolutely no evidence presented to the jury that defendant's father had anything whatsoever to do with the perpetration of the robbery three or four hours after he was inside Lakewood Pharmacy.
While the state's evidence, despite the contradictions and discrepancies, was sufficient to support the conviction against a challenge to sufficiency under the standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the evidence was not strong enough to support a conclusion that the newly discovered evidence probably would not have changed the verdict, when one considers the newly discovered evidence that would be presented at a new trial.
If a new trial is granted, the state will present the four eyewitnesses, each of whom will be forced to admit statements immediately after the robbery that the robber had an extremely neat, closely cropped beard or no beard at all, in the face of a police photograph showing defendant's long, lush, full and thick beard. The police investigator will be faced with the fact that the fingerprint on the adhesive tape casing, which was carefully preserved by the pharmacist for police investigators, was not defendant's print. And the defense will present the twelve alibi witnesses, several of whom have no basis for bias, traveling from Alabama to establish defendant's presence there at times inconsistent with the robbery. Then the defense will present the new evidence. Steve Brown will testify that Gary Stanford admitted that he and Frank Burzik had committed the Lakewood robbery and enjoyed the fact that two Alabama men, father and son, were arrested for his crime. He will explain that Stanford was concerned that Burzik, the actual robber, might become paranoid and reveal the robbery, especially since Burzik (as was the robber) was a needle-using dilaudid "junkie," and that Stanford was relieved when defendant was convicted.
Brown's testimony will be corroborated by three tape recorded conversations, in which the jury will hear Stanford's voice boasting of the "truck load of dilaudids" stolen by him and Burzik from Lakewood Pharmacy and of the arrest of a "young dude and his old man for the robbery" so that "we don't have shit to worry about."
Finally, the jury will be shown Burzik's resemblance to both defendant, when clean shaven, and to the assailant depicted in the initial composite drawings.
The newly discovered evidence, it if had been admitted at defendant's trial, would have tended to discredit the eyewitness testimony which was already undermined by inconsistencies and discrepancies, by lack of physical evidence, by significant alibi evidence and by the fingerprint on the adhesive tape casing handled by the robber and preserved for police examination. We therefore conclude that the newly discovered evidence probably would have changed the verdict and that defendant is entitled to a new trial on the basis of the newly discovered evidence which (on this record) would be admissible at a new trial.
Decree
The conviction and sentence are set aside, and defendant's motion for a new trial based on newly discovered evidence is granted. The case is remanded to the district court.
NOTES
[1] The trial judge set aside the conviction of defendant's father on the basis of insufficient evidence.
[2] This statement came after the following words by Brown:

Hey man, you all right, Gary? [Laughter.] Too bad there ain't no more scores like the Lakewood drugstore job, huh dude? Shit. Remember that shit, bro? I wish I was smart enough to have a fuckin' score that sweet, bro.
[3] In Talbot this court emphasized that the trial judge's duty in deciding a motion for new trial based on newly discovered evidence is not to determine the guilt of the person who confessed after the trial or the innocence of the accused, or to weigh the new evidence as though the deciding judge were a jury determining what is true and what is false. Rather, the judge's duty is as follows:

The judge's duty [is] the very narrow one of ascertaining whether there was new material fit for a new jury's judgment. If so, will honest minds, capable of dealing with evidence, probably reach a different conclusion, because of the new evidence, from that of the first jury? Do the new facts raise debatable issues? Will another jury, conscious of its oath and conscientiously obedient to it, probably reach a verdict contrary to the one that was reached on a record wholly different from the present, in view of evidence recently discovered and not adducible by the defense at the time of the original trial?
408 So.2d at 885.
[4] The redactors' comment to La.Code Evid. art. 804 B(3) states that the rule "basically restates prior Louisiana law."
[5] It is the hearsay statement of the declarant, and not the testimony of the witness on the stand, that must be corroborated. The witness on the stand is under oath and subject to cross examination, and can be tested for credibility by the usual procedures. Thus, the testimony of the witness at trial is not subject to the corroboration requirement. McCormick on Evidence, supra, 824 n. 10; Louisell & Mueller, supra, § 489.
[6] At the new trial ordered by this decision, defendant will have to show that the declarant is then unavailable in order to introduce the declarations.
[7] A fifth eyewitness did not see the robber, but saw a man matching the robber's description outside the pharmacy several hours earlier.
[8] Eyewitness testimony is at the same time the most trusted of evidence and too often the least reliable. Lawrence Taylor, Eyewitness Identification § 1 (1982). At least in the absence of physical evidence, the identification of strangers is proverbially untrustworthy. United States v. Wade, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967), quoting The Case of Sacco and Vanzetti 30 (1927).
[9] The confusion of the eyewitnesses may be explained by the resemblance of defendant to Burzik, named by Stanford's statement as the gunman in the Lakewood Pharmacy robbery. The court has examined the Identi-Kit composites rendered by three eyewitnesses immediately after the robbery, comparing the composites to the photograph of Burzik with transparent overlays of a short beard and glasses, and has confirmed the resemblance.
[10] Defense counsel stresses the unlikelihood that these witnesses would travel across two states to perjure themselves for the benefit of a person to whom they are not related.