762 So.2d 1247 (2000)
STATE of Louisiana
v.
Gerald HAYNES.
No. 99 KA 1973.
Court of Appeal of Louisiana, First Circuit.
June 23, 2000.
*1249 Doug Moreau, District Attorney, Wick Cooper, Assistant District Attorney, Baton Rouge, for Appellee State of Louisiana.
Frederick Kroenke, Baton Rouge, for Appellant Defendant Gerald Haynes.
Before: FOIL, WHIPPLE and GUIDRY, JJ.
FOIL, Judge.
The defendant, Gerald Haynes, was charged by bill of information, jointly with Larry Lynute, with one count of attempted second degree murder, a violation of La. R.S. 14:27 and La. R.S. 14:30.1. He pled not guilty and moved for a separate trial from Lynute on the charge, which was granted. Prior to trial, the state filed a motion in limine, asking that the trial court not allow the defense to introduce at trial an affidavit signed by Lynute stating that the defendant was not involved in the instant offense. The trial court ruled that the affidavit was admissible and denied the motion. The state sought supervisory relief from this court, arguing that the affidavit was not admissible at trial under La.Code Evid. art. 804(B)(3). This court granted the state's writ application and ordered Lynute's affidavit excluded from evidence at trial. State v. Haynes, 94-0490 (La.App. 1 Cir. 3/17/94). The defendant sought supervisory relief from that ruling, however, the Louisiana Supreme Court denied his writ application. State v. Haynes, 94-0675 (La.3/21/94), 635 So.2d 225. Following a jury trial, the defendant was found guilty as charged.
Thereafter, the state filed a habitual offender bill of information against the defendant, alleging that the defendant was a third felony habitual offender. The predicate offenses alleged were a January 10, 1992 Nineteenth Judicial District Court guilty plea to possession with intent to distribute cocaine under docket # 1-92-203 (predicate # 1), and a March 2, 1994 Nineteenth Judicial District Court guilty plea to attempted distribution of cocaine under docket # XX-XX-XXX (predicate # 2). The defendant initially admitted to the allegations of the bill, but thereafter withdrew his admission. Following a hearing on June 24, 1994, he was adjudged a third felony habitual offender and was sentenced to life imprisonment without benefit of *1250 probation, parole, or suspension of sentence. Defense counsel orally moved to appeal, but the appeal was not perfected.
On July 8, 1997, upon new defense counsel's motion to correct the illegal sentence, the district court "amended" the defendant's habitual offender adjudication to second felony habitual offender and "set aside" the previous sentence.[1] Subsequently, the defendant was resentenced to thirty-six years at hard labor without benefit of probation, parole, or suspension of sentence.
In the instant appeal, the defendant challenges his conviction, designating one counseled assignment of error and six pro se assignments of error. He filed a separate appeal from his habitual offender adjudication and sentence.[2]

FACTS
On October 8, 1993, Clarence Bennett was the victim of a homicide. According to the investigating officer, Detective Michael Verrett, the defendant and Larry Lynute arrived at the scene after the homicide occurred. The defendant was agitated and upset and indicated that Bennett had been his friend. A Polaroid photograph of Lynute, Bennett, and the defendant was recovered from Bennett's vehicle. This photograph was introduced into evidence at trial as State Exhibit # 1. Detective Verrett testified that both the defendant and Lynute were considered potential witnesses in the Bennett homicide and were treated as such. The defendant came to the station at about 4:00 a.m. on the night of the homicide. Detective Verrett advised the defendant of the identity of the suspects (Cedric and Troy Knight), and showed him a photographic lineup of one of the suspects. The detective cautioned the defendant against seeking retaliation against the suspects.
The victim in the instant offense, Demarcus Williams, was shot in the chest at 12462 Cate Street on October 10, 1993, at approximately 4:23 p.m. At the time of the shooting, Brian Knight (Cedric and Troy Knight's brother) was standing between his yard at 12484 Cate Street and a neighbor's yard working on his bicycle. The victim, Kedrick Rogers, Terryl Green, and Derrick Lewis were out in the yard with Knight. The shooting occurred when a car drove slowly down the street and the passenger opened fire on the men in the yard. The passenger fired three to five shots, one of which struck Demarcus Williams.
The car passed within approximately fifteen feet of Knight. The vehicle's occupants did not have their faces covered. Knight testified that the shooter was Larry Lynute and the driver was "Scar Face." Knight identified the defendant in court as "Scar Face." He also knew the defendant by the nickname "June." Knight knew "Scar Face" from the neighborhood and had previously seen him driving the car used in the shooting. He also knew Lynute from the neighborhood and because Lynute had previously been to his house to visit his brothers. Knight testified that Lynute's nickname was "Bo ." Knight identified State Exhibit # 1 as depicting "Bo, Clarence and Scar Face."
Derrick Lewis also testified at trial. He stated his attention was drawn to the car used in the shooting because its brakes were squeaking loudly. Lewis recognized the occupants of the car from the neighborhood. He recognized the shooter as "Bo" and the driver as "Scar Face." Lewis identified the defendant in court as the *1251 driver and stated that the defendant was frowning during the shooting.
Terryl Green also testified at trial that his attention was drawn to the car used in the shooting due to its squeaking brakes. He saw the faces of the occupants of the car and recognized the shooter as "Bo" and the driver as "Scar Face." He identified the defendant in court as "Scar Face."
The victim also testified at trial. He stated he did not see the car involved in the shooting until after he had been shot. He fell backwards to his knees and was able to see the occupants of the car, whom he recognized from the neighborhood. The victim stated he recognized the passenger as Larry Lynute, who he knew as "Bo" and the driver as "Scar Face." He identified the defendant in court as "Scar Face." The victim testified that the bullet that struck him bounced off of one of his ribs and passed through his heart and lungs before exiting his body.

ADMISSIBILITY OF EVIDENCE
In his sole counseled assignment of error, the defendant contends that the trial court erred in holding that the affidavit of Larry Lynute was inadmissible hearsay. The affidavit in question involves an admission against penal interest, the admissibility of which is controlled by La.Code Evid. art. 804. This article provides certain exceptions, in cases in which the declarant is unavailable, to the general rule against admissibility of hearsay statements. It provides, in pertinent part:
A. Definition of unavailability. Except as otherwise provided by this Code, a declarant is "unavailable as a witness" when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court. This includes situations in which the declarant:
(1) Is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement;
. . . .
B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
. . . .
(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
In State v. Hammons, 597 So.2d 990 (La.1992), the supreme court discussed Louisiana's rule as to statements against penal interest. The court stated:
Admission of statements against interest, as a traditional exception to the hearsay rule, is based on necessity and trustworthiness. The unavailability of the declarant requirement generally establishes the need to admit his out-of-court statement. The "against interest" requirement assures some degree of trustworthiness, because a person ordinarily does not make a statement that is disadvantageous to himself without substantial reason to believe that the statement is true.
. . . .
When the statement is one against the declarant's penal interest, the circumstances surrounding the making of the statement may be significant in determining its trustworthiness. If a declarant admits sole responsibility for a serious crime, the statement is generally prima facie against interest so as to satisfy this requirement of the rule. However, if the statement is clearly self-serving, as when the declarant is seeking *1252 favorable treatment for himself in return for cooperation, the statement may be deemed not against his interest and thus may fall outside the exception....
When the statement tending to expose the declarant to criminal liability is offered to exculpate the accused, La. Code. Evid. art. 804 B(3) expressly requires corroborating circumstances indicating trustworthiness. The burden of satisfying the corroboration requirement is on the accused. That burden may be satisfied by evidence independent of the statement which tends, either directly or circumstantially, to establish a matter asserted by the statement. Circumstantial evidence of the veracity of the declarant as to the portion of the statement exonerating the accused is generally sufficient. Typical corroborating circumstances include statements against the declarant's interest to an unusual or devastating degree, or the declarant's repeating of consistent statements, or the fact that the declarant was not likely motivated to falsify for the benefit of the accused.
State v. Hammons, 597 So.2d at 996-997 (citations and footnote omitted).
Lynute's affidavit, dated February 11, 1994, states verbatim (in pertinent part) as follows:
I Larry Lynute noteing a swarn writen statement that Gerald Haynes was not Involved or Participate in the Crime that he is Being Blamed for. I am Stateing that I was there at the time of the incident. Gerald Haynes was at Mrs. Bertha McCoy's House Preparing for a funeral. i Larry Lynute is admitting to My involvement in the Matter at hand and that Gerald Haynes was not in Know way.
At the hearing on the state's pre-trial motion in limine, Lynute's defense counsel stated that Lynute would invoke his Fifth Amendment privilege to remain silent at trial. Lynute also invoked his Fifth Amendment rights at the hearing on the motion in limine when first called.
The defendant testified at the hearing. He stated that he knew Lynute and that he talked to Lynute following the offense when he was incarcerated across the hall from him at parish prison. The defendant testified that he obtained a blank affidavit form from the parish prison law library and passed it across the hall to Lynute. He admitted that Lynute did not actually write the substantive portion of the affidavit. The defendant claimed that Lynute gave him the affidavit form along with a piece of paper on which he had written the substantive portion of the affidavit. The defendant gave the documents to someone else who had nice handwriting and he copied what was on the note onto the affidavit form. The defendant stated he threw away the paper Lynute had written on. The defendant claimed he later observed Lynute sign the affidavit before a notary. He stated he gave the affidavit to his wife to "bring" to defense counsel.
On cross-examination, the defendant stated he remembered coming to court for motions on January 25, 1994. He stated that he had a conversation with his attorney in front of Lynute that day, as the three of them sat at the defense counsel table. The defendant testified that no mention was made of an affidavit on that particular day. He further stated that no mention was made of the charges against Lynute being dropped or reduced if he signed an affidavit.
When the state recalled Lynute to the stand, he stated he remembered being present in court for motions on January 25, 1994. Lynute testified that he overheard a conversation between the defendant and his attorney. He further stated it was his understanding after listening to that conversation that defense counsel could have the charges in this case reduced to negligent injuring.
Sidney Wayne Broussard, the attorney who notarized the affidavit, also testified at the hearing. He reviewed the affidavit *1253 and stated that it bore his original seal and signature. Mr. Broussard stated he did not remember Lynute in particular, pointing out that he notarized approximately 20-30 documents at the prison on the date stated on the affidavit. He testified that he did not read the documents he notarized at the prison because he was prohibited from giving legal advice. Mr. Broussard stated he did make certain that the inmates read the documents in front of him, and understood what they read and that they were under oath when they signed the documents. After viewing Lynute in the courtroom, Broussard was still unable to remember whether he was the person that signed the affidavit.
Bertha McCoy testified for the defense at the hearing. On October 10, 1993, she was at her home receiving food and friends in connection with her son's recent death. She stated she had sent for the defendant, who she knew only by his first name, and told him to be at her house between 1:30 and 2:00. McCoy stated that she remembered the defendant arriving at her house "between 1:30 and 2:00" in a car, though she subsequently testified that the defendant arrived at her home at "about 2:30." She spoke to the defendant "all day, off and on." The last time McCoy saw the defendant on October 10, 1993, it was "about 7:30 or 8:00 when he left."
On cross-examination, McCoy testified that her son, Clarence Bennett, had been dragged from his car and killed on October 8, 1993. She stated that she did not really know the defendant, but had sent for him to question him about her son's death because she had heard that he and her son had been together on the day of her son's death. She saw approximately fifteen people at her house on October 10, 1993. She could not remember the kind or color of car that the defendant drove that day, and stated that there could have been someone else in the car, but she did not know that person. McCoy stated that the defendant told her he heard that Troy and Cedric Knight killed her son.
McCoy's trial testimony was similar to her testimony given at the hearing on the motion in limine. She added that she remembered that the defendant left her house at 8:00 because "somebody asked somebody else what time it was and they said, `Well it's 8:00. Let's go so they can get some rest."' She further added that the defendant spent most of his time at her home in the living room sitting beside her.
At trial, outside the presence of the jury, Lynute stated that if called to the stand, he would exercise his Fifth Amendment right not to testify.
In reviewing this assignment of error, we note that we previously ruled pretrial on the admissibility of Lynute's affidavit, holding it should not be admitted. The Louisiana Supreme Court subsequently denied writs, declining to disturb our ruling. Now, in this post-trial appeal, judicial efficiency demands that this court accord great deference to its pre-trial decisions on admissibility, unless it is apparent, in light of the subsequent trial record, that the determination was patently erroneous and produced an unjust result. State v. James, 98-2348, pp. 3-4 (La.App. 1 Cir. 6/25/99), 740 So.2d 200, 202. Such is not the case in the instant matter. A thorough review of the record convinces us that our pretrial ruling that Lynute's affidavit was not admissible under La Code Evid. art. 804(B)(3) was neither patently erroneous, nor did it produce an unjust result. The defendant's own testimony at the hearing on the motion in limine cast doubt on the origin of the statements made in the affidavit. Further, assuming that the affidavit did, in fact, accurately reflect Lynute's statements, he only confessed to being present "at the time of the incident[,]" and "involvement in the Matter at hand[.]" We find Lynute's statements were not "so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability ... that a reasonable man in his position would not have made *1254 the statement[s] unless he believed [them] to be true." See La.Code Evid. art. 804(B)(3). Moreover, Lynute's testimony at the motion in limine established that, if the statements made in the affidavit were his, they were motivated by Lynute's desire for a reduced charge of negligent injuring, and thus, were clearly self-serving and outside of the scope of La.Code Evid. art. 804(B)(3). See State v. Hammons, 597 So.2d at 996. Accordingly, this assignment of error is without merit.

PRO SE ASSIGNMENTS OF ERROR
The defendant raises six claims in a pro se brief. For the following reasons, we find no merit in his arguments.

Erroneous argument and jury instruction
In the defendant's first pro se argument, he claims the trial court erred by permitting the state to argue during voir dire and closing argument that the intent of one principal could be inferred or transferred to another, or that they could impute the actions or the specific intent of the shooter to him. The defendant further claims the court's jury instruction on the issue of principals was incorrect.
While all persons "concerned in the commission of a crime" are principals under La. R.S. 14:24, this rule has important qualifications. "[A]n individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state." State v. Pierre, 93-0893, p. 4 (La.2/3/94), 631 So.2d 427, 428; State v. Holmes, 388 So.2d 722, 726 (La.1980). It is not enough to find merely that his coconspirator or accomplice had the necessary mental state, since this intent cannot be inferred to the accused. State v. Holmes, 388 So.2d at 726.
Only a portion of the voir dire examination was transcribed, and the closing arguments are not in the record because no objection was raised. Accordingly, these issues were not properly preserved. La.Code Crim. P. art. 841. We note, however, that the portion of the voir dire included in the record indicates that the state did not refer to a transfer of the intent of the shooter to the defendant. Rather, the state claimed the defendant's intent to kill Cedric and Troy Knight was transferred to Demarcus Williams, the unintended victim of his attack on the Knights. This type of "transferred intent" is well recognized in the jurisprudence. See State v. Druilhet, 97-1717 (La.App. 1 Cir. 6/29/98), 716 So.2d 422. See also State v. Johnson, 29,629 (La.App. 2 Cir. 8/20/97), 698 So.2d 1051.

Shifting the burden of proof
In his second pro se argument, the defendant claims the court erred in giving an instruction that impermissibly shifted the burden of proof, in violation of Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Although the jury charges are not in the record, the defendant sets forth what he believes to be the erroneous charge, which consists of nothing more than the definition of specific intent as contained in La. R.S. 14:10(1). The defendant further complains of the state's questions directed to the jurors on the issue of specific intent and transferred intent. However, the state merely asked if the jurors had "problems" with the idea of specific intent, referencing the statutory definition. As previously noted, the transcript reflects that the transfer of intent to which the state referred was the shooting of an unintended victim during an intentional act.

Polling of the jury
In his third assignment of error, the defendant urges that the court should have declared a mistrial because the verdict was returned by an incorrect number of jurors. When the jurors were initially polled, three members of the jury responded "no" when asked if the verdict to convict was their verdict. However, the court noted the verdict was incorrect and asked that the jury be repolled. A proper verdict (10-2) was returned.
*1255 La.Code Crim. P. art. 810 provides for the form of a verdict, in part as follows:
When a verdict has been agreed upon, the foreman shall write the verdict on the back of the list of responsive verdicts given to the jury and shall sign it. There shall be no formal requirement as to the language of the verdict except that it shall clearly convey the intention of the jury.
Jury polling is regulated by La.Code Crim. P. art. 812, which provides in part:
If, upon polling all of the jurors, the number of jurors required by law to find a verdict answer "Yes," the court shall order the clerk to record the verdict and the jury shall be discharged. If, upon polling all of the jurors, the number required to find a verdict do not answer "Yes," the jury may be remanded for further deliberation, or the court may declare a mistrial in accordance with Article 775.
The defendant now apparently contends that the trial court had no discretion to repoll but could only declare a mistrial. However, the defendant made no contemporaneous objection at trial to the polling procedure used by the trial court. La. Code Crim. P. art. 841. See also State v. Amato, 96-0606 (La.App. 1 Cir. 6/30/97), 698 So.2d 972; writs denied, 97-2626 and 97-2644 (La.2/20/98), 709 So.2d 772. The trial court's actions were not coercive but merely an attempt to clarify the return of an improper verdict upon the jury's signal that a proper verdict had been reached. The record does not support the defendant's claim that the juror had changed her vote from "guilty" to "not guilty." Rather, it appears the juror was correcting an error. While it would have been a better practice, upon counting three "no" votes, to remand the jury for more deliberation or to determine on the record whether the initial polling was erroneous or if further deliberations were needed, a mistrial is required only where the jury is unable to reach a verdict by the proper concurrence.

Ex parte communication with the jury
In his fourth pro se assignment of error, the defendant claims the trial court abridged his Sixth Amendment right to a fair and impartial jury by engaging in ex parte conversations with a juror. During breaks in the trial, the court noticed on at least two occasions that the defendant stood at the cell-gate door at a time when he had no reason to be there. The court interpreted the defendant's actions as deliberate attempts to sabotage the trial by causing the jurors to note his presence in jail. The court noted that one of the jurors, Mr. Gomez, also had been present when the defendant stood at the cell-gate.
Outside the presence of the jury, the court warned the defendant that his conduct would not be tolerated and notified the prosecutor and defense counsel that they would determine whether or not the juror should be removed. The court then called Mr. Gomez into court to question him about what he had seen. The court indicated that it already had discussed the matter with the juror but that it needed to conduct the questioning "before the lawyers." The court then asked if the juror had seen anything unusual and if he had mentioned to other jurors what he had seen. Mr. Gomez indicated that he had seen the inmates come out of the holding cell, he had not noticed anyone in particular, he had not recognized anyone, and added that he was familiar with cell-gate activity because at one time he was employed building prisons. He stated he had not discussed the matter with anyone. Upon questioning by defense counsel, Mr. Gomez reiterated that he had not recognized anyone. Thereafter, both of the attorneys indicated they were satisfied with the proceedings and that there were no problems with the juror.
La.Code Crim. P. art. 831, concerning proceedings when the presence of the defendant is required, provides in pertinent part as follows:

*1256 A. Except as may be provided by local rules of court in accordance with Articles 522 and 551, a defendant charged with a felony shall be present:
. . . .
(3) At the calling, examination, challenging, impanelling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror;
In State v. Copeland, 419 So.2d 899 (La. 1982), the Louisiana Supreme Court found merit in a claim that the trial court's actions in soothing two emotionally distraught jurors while they were sequestered violated this article. The Court concluded that, "[i]n essence, the trial judge quizzed the two jurors and determined that they were able to continue to serve on the jury without complying with La.C.Cr.P. art. 831(3)'s mandate that defendant be present at such stage of the proceedings." State v. Copeland, 419 So.2d at 905.
Herein, there is no allegation that the court's ex parte questioning was to determine if the juror should continue serving on the jury, and there is no indication the trial court initially sought out the company of the juror. Rather, it appears the court simply noticed the juror's presence when the court felt the defendant was attempting to compromise the proceedings and briefly questioned him. However, the proceedings to determine if the juror should continue serving on the jury were conducted on the record, in the presence of the defendant, his attorney and the state; and both the state and the defense were given the opportunity to note their concerns about the juror or to request his removal from the jury. Although neither side requested the opportunity to determine if the court's brief ex parte questioning would affect the juror's deliberations, it is clear from the juror's responses that he did not note anything remarkable about the incident. Accordingly, we do not find the defendant's right to be present at each significant stage of the proceedings was abridged.

Ineffective assistance of counsel
In his fifth pro se assignment, the defendant claims he received ineffective assistance of counsel when his attorney argued to the jury that, in order to convict, the jury must find that the defendant had the specific intent to kill or to inflict great bodily harm.
In order to establish an ineffective assistance of counsel claim, relator must prove that counsel's performance was deficient; that is, he made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. In addition, relator must show that the deficient performance prejudiced the defense; that is, the errors were so serious as to deprive the accused of a fair trial, one whose result is reliable. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
During the voir dire questioning of one panel, defense counsel tracked part of La. R.S. 14:30.1 in describing what the state would need to prove. Since the defendant was charged with attempted second degree murder, the state was required to prove that the defendant had the specific intent to kill and could not rely on proof of the specific intent to commit great bodily harm. See, e.g., State v. Mitchell, 99-0283 (La.App. 1 Cir. 11/5/99), 745 So.2d 208. Here, immediately after counsel finished his remarks, the state asked for a bench conference; and, after the conference, defense counsel correctly noted to the jury that the state had to prove the specific intent to kill in order for the jury to convict. We do not find that counsel's remarks constituted an argument to the jury, and it is clear that counsel's error was pointed out to him with discretion and in a manner that would not call the jury's attention to the brief misstatement. Counsel's performance was not deficient, nor was the defendant prejudiced by this action.

*1257 Brady violation

In his final pro se assignment of error, the defendant claims the prosecution failed to disclose a "deal" made with co-defendant Larry Lynute to prevent him from testifying at trial. The defendant claims Lynute signed an affidavit prior to trial in which he confessed to the offense and indicated petitioner was not present during the offense.[3] Although the defendant subpoenaed Lynute to testify, Lynute invoked his Fifth Amendment right to remain silent during the hearing on the motion in limine. The defendant claims that after the trial, he learned Lynute had been allowed to enter a guilty plea and had received a thirty-year sentence; and he claims the plea and sentence were the result of an agreement with the state to deprive the defendant of Lynute's testimony.
Only matters contained in the record can be reviewed on appeal. State v. Vampran, 491 So.2d 1356, 1364 (La.App. 1st Cir.), writ denied, 496 So.2d 347 (La. 1986). This record does not contain any evidence of Lynute's plea or the circumstances under which it was made, and thus the issue is not susceptible to review at this time. The defendant's claim that the state arranged for Lynute to invoke his privilege against self-incrimination, thereby depriving the defendant of his favorable testimony, and failed to disclose this arrangement to the defense must be raised through an application for post conviction relief filed in the trial court, where the court can conduct a hearing if necessary to resolve the defendant's allegations.
CONVICTION AFFIRMED.
NOTES
[1] The state did not challenge the use of this procedure to correct the defendant's habitual offender adjudication and sentence. Thus, the issue of whether a third felony habitual offender adjudication and sentence that violates State ex rel. Mims v. Butler, 601 So.2d 649 (La.1992) (on rehearing) may be corrected by the district court as an "illegal sentence" under La.Code Crim. P. art. 882(A) is not before this court. See State v. Counterman, 501 So.2d 766 (La.1987).
[2] See State v. Haynes, 99-1974, also rendered this date.
[3] This affidavit also was the subject of the defendant's counseled assignment of error.