STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 03-397


STATE OF LOUISIANA

VERSUS

ELBERTINE DEMERY SYKES


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. C1092
HONORABLE ERIC ROGER HARRINGTON, DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*


**BILLY HOWARD EZELL
JUDGE**


\*\*\*\*\*\*\*\*\*\*


Court composed of Ulysses Gene Thibodeaux, Sylvia R. Cooks, and Billy Howard Ezell, Judges.


**AFFIRMED.**

**Van Hardin Kyzar**
**District Attorney, 10th Judicial District Court**
**P. O. Box 838**
**Natchitoches, LA 71458-0838**
**(318) 357-2214**
**Counsel for: Plaintiff/Appellee**
**State of Louisiana**

**Steven D. Crews**
**Corkern & Crews, L.L.C.**
**P. O. Box 1036**
**Natchitoches, LA 71457-1036**
**(318) 352-2302**
**Counsel for: Plaintiff/Appellee**
**State of Louisiana**

**Dmitrc Ian Burnes**
**Burnes & Burnes**
**711 Washington Street**
**Alexandria, LA 71309-0650**
**(318) 448-0482**
**Counsel for: Defendant/Appellant**
**Elbertine Demery Sykes**

**EZELL, JUDGE.**

On January 6, 2000, the Defendant, Elbertine Sykes, and Co-defendant, Vernon Cox, were charged by grand jury indictment with one count of first degree murder. The Defendant was arraigned on January 21, 2000, and entered a plea of not guilty. At a hearing held March 29, 2000, the State moved to orally amend the bill to charge the Defendant, Elbertine Sykes, as a principal to second degree murder, a violation of La.R.S. 14:24 and La.R.S. 14:30.1 The court accepted the amendment. After the filing of several pre-trial motions and several pre-trial writ applications to this court, the Defendant's jury trial began on July 15, 2002. On July 18, 2002, the Defendant was found guilty of second degree murder. On November 22, 2002, the Defendant filed a motion for new trial and a motion for post-verdict judgment of acquittal. Both of which were denied by the trial court at a hearing held that same date. After hearing testimony on that same date, the trial court sentenced the Defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The Defendant is presently before this court challenging her conviction by alleging eight assignments of error.

## FACTS

A detailed version of the facts is set forth in the discussion of Assignments of Error Numbers Three and Four. In sum, the Defendant procured her ex-husband, Vernon Cox, to kill her husband, William Sykes.

## ASSIGNMENTS OF ERROR NUMBERS THREE & FOUR

Because these two assignments involve a review of the record for sufficient evidence, we have addressed them first. *State v. Hearold*, 603 So.2d 731 (La.1992). This court observes that, prior to trial, Defendant gave several statements to the authorities that she recanted at the trial. In Assignment of Error Number Three, the Defendant claims the trial court erred by denying ground two of her motion for new

1

trial, in which she asserted that "no direct evidence of Appellant's involvement was presented at trial and the circumstantial evidence presented failed to exclude the reasonable hypothesis that persons unknown and unconnected with Appellant robbed and killed William Sykes." Although the Defendant did not state such in her motion, the court finds that ground two was an assertion that the verdict was contrary to the law and evidence. La.Code Crim.P. art. 851(1). In Assignment of Error Number Four, the Defendant claims the trial court erred in denying ground one of her motion for new trial, wherein she asserted that the verdict was contrary to the law and evidence. She also asserts in Assignment of Error Number Four that the trial court erred in denying her motion for post-verdict judgment of acquittal, in which she alleged that the evidence, when viewed in a light most favorable to the State, does not reasonably support a finding of guilt.

The supreme court has stated the following regarding the distinction of claims raised in a motion for new trial and a motion for post-verdict judgment of acquittal:

> However, a motion for new trial presents only the issue of the weight of the evidence, *see Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) (setting aside a verdict as against the weight of the evidence, as opposed to the insufficiency of the evidence, under the Due Process Clause does not bar retrial) and is examined under the so-called thirteenth juror standard under which the trial judge re-weighs the evidence. *State v. Voorhies*, 590 So.2d 776, 777 (La.App. 3 Cir.1991). The question of sufficiency is properly raised by a motion for post-verdict judgment of acquittal. La.C.Cr.P. art. 821; *State v. Demery*, 28,396, p. 6 (La.App. 2 Cir. 8/21/96), 679 So.2d 518, 522. *But see* Article 851 comment (d) ("[i]t is the duty of the trial judge to pass upon the sufficiency of the evidence" once ground (1) is raised under Article 851).
>
> In the instant case, the constitutional issue of sufficiency is treated in assignment of error number 1 because the denial of a motion for new trial based upon La.C.Cr.P. art. 851(1) is not subject to review on appeal. *State v. Skelton*, 340 So.2d 256, 259 (La.1976) ("[W]e have uniformly held that a bill of exceptions reserved to the refusal of the trial judge to grant a motion for a new trial based on Article 851(1), relative to sufficiency of the evidence presents nothing for our review.") (citations omitted); *State v. Bartley*, 329 So.2d 431, 433 (La.1976) ("It is well established in Louisiana that an assignment of error reserved to the

2

denial of a motion for a new trial alleging that the verdict is contrary to the law and the evidence presents nothing for appellate review.") (citations omitted).

*State v. Snyder*, 98-1078 (La. 4/14/99), 750 So.2d 832, 859, n. 21.(alteration in original)

Likewise, we find Defendant's claims that the trial court erred in denying her motion for new trial because the verdict was contrary to the law and evidence presents nothing for this court to review. The only issue reviewable in the present appeal is the constitutional issue of sufficiency of the evidence, which was raised in the Defendant's motion for post-verdict judgment of acquittal. Even though the arguments raised in Assignment of Error Number Three pertain to a claim raised in the motion for new trial which is not reviewable on appeal, the court will address the arguments as they relate to the insufficiency of the evidence claim.

The Defendant was found guilty of the second degree murder of her husband. She claims, however, that no direct evidence was presented linking her to the murder and that the circumstantial evidence presented failed to exclude the reasonable hypothesis that someone unknown and/or unconnected to her killed her husband. The Defendant also claims the evidence failed to prove that she specifically intended to kill or cause great bodily harm to her husband.

On November 11, 1999, the Defendant called the Natchitoches Parish Sheriff's Office and reported her husband missing. The Defendant stated that her husband had been missing since 6:00 the previous morning, November 10, 1999. According to the Defendant, her husband went hunting, but she did not know if he went hunting at St. Maurice or Lime Kiln. She knew he went hunting with a nephew but did not know the nephew's name.

Detective Mike Wilson was notified of the victim's disappearance. On his way to interview the Defendant, the detective learned that the victim's truck had been

found on Lime Kiln Road. Although the vehicle was thoroughly searched, no evidence was found. When Detective Wilson spoke with the Defendant, she reiterated that her husband had gone hunting the previous morning and had not returned. She gave a physical description of her husband as well as the vehicle he was driving. According to Detective Wilson, the Defendant did not mention Vernon Cox or Lime Kiln Road during her initial interview.

Later, on November 11, 1999, the detective took a recorded statement from the Defendant. The Defendant again stated that her husband left around 6:00 in the morning. The Defendant maintained that she did not know which nephew accompanied her husband on the hunting trip. The Defendant had gone to court that morning and arrived back home around 12:30 p.m. Later, around 3:15p.m. or 3:30 p.m., the Defendant went to work. The Defendant made a few calls and received a few calls at work concerning the victim's whereabouts. The Defendant arrived at home around 12:30 a.m.

On Friday, November 12, the Defendant called Detective Wilson to tell him that she received an anonymous call from a female who informed her that she saw the victim's truck at the end of Lime Kiln Road. The Defendant asked the detective to go look at the end of Lime Kiln Road for her husband. On Saturday, November 13, the Detective went back to Lime Kiln Road with some others and after a three and one-half hour search, one of the deputies spotted a sweater in the bushes. According to Detective Wilson, the sweater was white with multiple colors on it and was not there the day before. A member of the search team identified the sweater as belonging to the victim. The victim's body was discovered approximately thirty to forty-five minutes later at the end of Lime Kiln Road. The victim was found lying on his back with a twelve-gauge shotgun lying two to three feet away from his body. According to Detective Wilson, the gun had nothing to do with the murder. When asked if any

4

money was found on the victim, Detective Wilson stated that a small amount of change was found in the victim's pocket.

The Natchitoches Parish Coroner was called out to the scene and found multiple skull fractures after examining the victim's body. Feeling that the victim's death was not accidental, the coroner arranged for an autopsy. Dr. Steven Cogswell performed an autopsy and found that the victim received a close-range shotgun wound to the back of his head. Dr. Cogswell determined that a person shot the victim from behind with the barrel of the gun less than three feet away from the victim's head. The shot was also angled forward and upward. The wadding as well as the shot charge actually went into the victim's head. According to Dr. Cogswell, the victim had no defensive injuries, i.e., no injuries to his hands or face. Dr. Cogswell also found no signs of a struggle, i.e., no broken buttons or torn pockets. Because of the nature of the wound, Dr. Cogswell opined that the victim's death was instantaneous and any object he was holding would have most likely fallen right where he was holding it.

Dr. Cogswell described the victim's body as being mildly decomposed. Although no one argues that the victim was killed on a different day, Dr. Cogswell suggested that since the temperatures in mid-November are generally mild, the victim's body should have reached a moderate level of decomposition if he was killed on Wednesday and found on Saturday.

Based on a phone call to the Natchitoches City Police approximately five to six months *before* the victim's murder, the investigation began to focus on Vernon Cox, the Defendant's ex-husband. The phone call was made by Mr. Cox's twin sister, Vivian Cox Cahee. During her own testimony, Ms. Cahee testified that her brother, Vernon Cox, lived with her in Houston, Texas in 1999. The Defendant and some of her children visited Mr. Cox one weekend in 1999. According to Ms. Cahee, the Defendant and Mr. Cox were in constant contact after the visit, talking with one

another about once a day. One day after the Defendant's visit, Mr. Cox borrowed his sister's vehicle but did not return it as planned. Instead, Ms. Cahee received a call informing her that her car had been damaged and the tires were taken off.

When Ms. Cahee talked with Mr. Cox a couple of months later, Mr. Cox was in a rehabilitation center in Alexandria, Louisiana. Mr. Cox told his sister that he was under a lot of pressure because the Defendant wanted him to kill her husband. But, Mr. Cox assured his sister, he was not going to do what the Defendant asked. Ms. Cahee agreed that Mr. Cox told her of the Defendant's request in the summer of 1999 and that Mr. Cox was in Natchitoches when the murder occurred. Ms. Cahee called the Natchitoches Police Department and reported what her brother told her.

After learning of Ms. Cahee's phone call and picking up Mr. Cox, Detective Wilson spoke with the Defendant again. Detective Wilson explained to the Defendant that Mr. Cox had been taken into custody and was being interviewed in connection with her husband's death. Detective Wilson took another recorded statement from the Defendant on November 17, 1999. Detective Wilson described the Defendant as being "extremely nervous," "continuously rubbing her hands," and "looking back and forth out of the window." At the beginning of the statement, the Defendant told Detective Wilson that she only contacted Mr. Cox when she needed help with her children or when he needed to borrow money. When asked when she last had a "face-to-face" conversation with Mr. Cox, the Defendant stated that at Mr. Cox's request, she met him at the college campus and spoke with him. The Defendant stated that she and Mr. Cox talked about money and Mr. Cox asked if her husband's body had been found. According to the Defendant, Mr. Cox also went to her residence one night but was told to leave by her brother.

The tape recorder was turned off for a period, during which the Defendant asked about Mr. Cox's arrest. Detective Wilson told the Defendant that Mr. Cox had

6

been arrested and was speaking with them. According to Detective Wilson, the Defendant stopped him during their conversation and stated, "He did it." The Defendant elaborated that Mr. Cox killed her husband. The tape recorder was turned back on and Detective Wilson asked the Defendant if she had discussed with anyone "about any harm coming to [her] husband." The Defendant responded, "Vernon had mentioned several times that he was going to rob my husband." When Mr. Cox asked her how much money her husband carried on him, the Defendant told him he carried two to three thousand dollars. When asked if she talked with Mr. Cox on November 10 or any day prior about her husband, the Defendant responded:

> It's possible that I have, I'm not sure at this time. I did speak with Vernon. Vernon did ask me did my husband go hunting and I said yes, he goes hunting. He asked where did he go at. I told him that from St. Maurice, over on 84, and he goes on 71, and he hunts on his property back there. Prior to me talking to Vernon, Vernon had told me that one of the nephews that work [with] him at a previous job had told him that William was a big time drug dealer and that he carries a lot of money and that he was going to rob him.

The Defendant explained that Mr. Cox, not the nephew, said he was going to rob her husband. When Detective Wilson asked the Defendant if Mr. Cox ever told her he was going to rob her husband, the Defendant replied:

> He never told me that he was going to rob him, he asked me how much money did he carry with him. I told him about two or three thousand dollars. When Vernon asked me about it, on the day that he said that he was going to go hunting I didn't let him carry that much money. He only had $200 on him.

Detective Wilson asked the Defendant if she knew that her husband would be robbed on November 10. The Defendant replied that she did not know he would be robbed that day. She only knew that Mr. Cox said he was going to rob her husband. According to the Defendant, Mr. Cox did not tell her when he was going to rob the victim or if he and the nephew were going to do it. The Defendant told Detective Wilson that Mr. Cox did not tell her he was going to harm her husband.

7

The Defendant continued to explain that when her husband did not return from hunting, she suspected that he may have been robbed, so she reported him missing. When asked if she spoke with Mr. Cox after she reported her husband missing, the Defendant answered:

> After I talked to the detective, I went and I found where Vernon was. I asked him did he do anything to my husband and he said no, he hadn't seen my husband. I told him that each conversation that I had with you, you said that you were going to rob him. And that my husband was suppose to be back home and he never did come home. I asked him did he rob my husband. He said he told me no. But after my husband, after the detective kept coming out and my husband never returned home, I went back and I spoke with Vernon. I said Vernon yes you have done something to my husband, where is he. He said I don't know what you are talking about, I didn't do anything to you husband. I said yes you have, you done something to him.

The Defendant stated that one of the times she talked with Mr. Cox, she went to his work. According to the Defendant, she was afraid to tell anyone the things Mr. Cox was telling her because Mr. Cox threatened to kill her and her children.

When asked if Mr. Cox told her that he killed her husband, the Defendant stated that Mr. Cox never told her that he killed her husband, but he began looking paranoid and said he could not be seen with her. The Defendant then stated:

> That's when I called the lady in Texas and I told where they had found the truck at. She told me that's in the area where my husband was and to keep looking, don't give up. That's when I told my brother please go out there and try to find my husband because he might be living. Because the lady had told me that that's where they could find him at, that she seen blood.

When asked if Mr. Cox had ever spoken to her about being armed, the Defendant stated that he told her he found a weapon at his girlfriend's house. Joann Williams, the person with whom the Defendant was living in November 1999, confirmed that she had a shotgun and Mr. Cox knew where the gun was located. When the police came to get the gun after the murder, the gun was gone. Ms. Williams also had two

8

teenage sons that lived with her as well as her dad. Richard Beighley, an expert in firearm analysis, testified that wadding retrieved from the victim was consistent with having been fired from a twenty (20) gauge shot shell. Ms. Williams did not know the gauge of the shotgun she once had in her home.

Mr. Cox told the Defendant that if her husband tried to defend himself during the robbery, he would have to shoot him. The Defendant asked Mr. Cox where he would get a gun and Mr. Cox stated that he found a rifle behind his girlfriend's couch. According to the Defendant, she told Mr. Cox that she did not want him hurting her husband. She asked Mr. Cox to just take her husband's money and not kill him. The last thing Mr. Cox told her was that he would do what he had to do.

Returning to the day of her husband's disappearance, the Defendant told Detective Wilson that Mr. Cox came by her work around 8:30 the Wednesday night of her husband's disappearance. Mr. Cox was driving her husband's truck. According to the Defendant, Mr. Cox told her that he had robbed and killed her husband but would not tell her where his body was. The Defendant called to report her husband as missing but did not tell the authorities what Mr. Cox told her since she was afraid of him.

After the interview, Detective Wilson and the Defendant continued speaking and the Defendant prepared another statement introduced as State-22. The statement is dated November 16, 1999. Much of the statement is consistent with her interview. The Defendant also stated that when Mr. Cox called to tell her he was going to rob her husband, she told him she did not care what he did. She did not know, however, that he would harm her husband. Mr. Cox also told her that one of the victim's nephews, John, had been trying to sell Mr. Cox a gun. Mr. Cox called the Defendant several

9

times. Sometimes he asked her what types of guns her husband had and he even asked her to bring him one of the guns. When the Defendant refused, Mr. Cox claimed he would get one himself. The Defendant asked him where he would get one, and Mr. Cox said he would get one from his girlfriend. According to the Defendant, Mr. Cox specifically stated that his girlfriend had a gun behind her couch. Joann Williams, Mr. Cox's girlfriend, confirmed that her dad kept a gun behind her couch. When Mr. Cox called to say he found a gun, the Defendant asked what he needed a gun for. Mr. Cox reiterated that he may have to protect himself. According to the Defendant, she again told Mr. Cox that he did not need to kill her husband. The Defendant repeated in her statement that Mr. Cox visited her at work on the Wednesday night of the disappearance driving her husband's truck. Although the Defendant asked Mr. Cox where her husband was, Mr. Cox would not tell her and threatened to kill her. The Defendant visited Mr. Cox on Friday and asked him to please tell her where her husband was. Mr. Cox told her that he and the victim went to Lime Kiln, that Mr. Cox went to rob the victim and had to kill the victim when he tried to protect himself. All Mr. Cox would tell her is to follow the main road in Lime Kiln and go all the way to the end. On the Sunday following the discovery of the victim's body, the Defendant called Mr. Cox and told him he was wrong for doing what he did. Mr. Cox called her on Monday and Tuesday. Mr. Cox wanted to borrow money but the Defendant would not lend him any. The Defendant claimed that she had not talked to Mr. Cox since that Tuesday.

Detective Wilson spoke with the Defendant again on November 18, at which time the Defendant told him that on November 11, she called Otis Maxey and asked him to meet her at the apartment where they often met one another. The Defendant asked Mr. Maxey to drive her husband's truck out to Lime Kiln Road. The Defendant told Detective Wilson that she withheld this information because she was afraid of Mr.

Cox. In connection with the investigation, Detective Wilson talked to John Sykes, a nephew of the victim. Nothing John told the detective helped the investigation. Detective Wilson also reviewed telephone records of phone calls made to the Defendant's house on Tuesday (apparently the Tuesday before her husband's disappearance on Wednesday). The Defendant had previously stated that the victim's nephew called her house before she left to go to work that day (again, apparently the Tuesday before her husband disappeared). The phone records from that Tuesday, however, revealed that the primary number calling her house that afternoon was a number assigned to the residence in which Vernon Cox was living.

Detective Wilson also recalled that when the Defendant reported her husband missing, she stated that she had been up half the night making phone calls. The phone records, however, indicated that only two calls were made from the Defendant's residence after she arrived home from work at 12:30 a.m. One phone call was made at 3:31 a.m. to an unidentified number and the other was to the residence at which Vernon Cox was residing. Joann Williams, the person with whom Vernon Cox was living in November 1999, confirmed that one of the numbers the Defendant called was her number. When asked during her own testimony about her previous statement to the 911 operator that she had been up half the night calling people to find her husband, the Defendant stated that she made some calls from work. Otis Maxey testified that he and the Defendant were lovers. Mr. Maxey knew the Defendant was married to the victim but he did not know she was married at one time to Vernon Cox. In fact, Mr. Maxey had never met Mr. Cox. The Defendant and Mr. Maxey also worked together at ConAgra. According to Mr. Maxey, the Defendant expressed unhappiness with her marriage and talked about "doing something herself." The Defendant told him that she "tried to put some poison in his food, and that didn't work." The Defendant never asked Mr. Maxey to do anything. Mr. Maxey did not think the

11

Defendant was serious until one night she came to work around 9:00 p.m. or 10:00 p.m. The Defendant told Mr. Maxey she had to do something. When Mr. Maxey asked her what was wrong, the Defendant said, "Well, I have to carry some shells to uh . . . Vernon." The Defendant did not tell Mr. Maxey why.

Later, the Defendant asked Mr. Maxey to move a truck back out to Lime Kiln Road. The Defendant said that she had done something crazy. When he asked her what she did, the Defendant told Mr. Maxey that she saw Mr. Cox riding in her truck with some "buddies." Mr. Cox left the truck somewhere and she needed "to get it back out there." Mr. Maxey drove the truck and followed the Defendant to the place where she wanted the truck dropped off. The Defendant told Mr. Maxey, "'Maxey I think I'' . . . . the word she used the 'F' word, but . . . you know, she messed up." When asked if the Defendant indicated whether or not the victim had any money on him, Mr. Maxey stated that the Defendant said the victim had money on him and he might have been robbed.

Once while they were in Houston, Mr. Maxey overheard the Defendant tell someone that she needed to do something to get out of "the relationship." Finally, Mr. Maxey admitted that he gave a statement a short while after the murder wherein he told police that he helped take the truck out to Lime Kiln Road. He did not tell police the other information because he wanted to get his "conscience clear" and he did not remember some of the things. On cross, Mr. Maxey admitted that he waited two years before making his second statement.

James Jefferson, Vernon Cox's employer in November 1999, testified that on the Saturday before the week of November 10 and 11, Mr. Cox requested that his work schedule be changed so that he could be off on Wednesday instead of Thursday. According to Mr. Jefferson, Mr. Cox was actually off on both Tuesday, November 9

12

and Wednesday, November 10. Mr. Jefferson also testified that after November 11, Mr. Cox received a visitor at work. Since visitors were not allowed, Mr. Jefferson went to inspect the situation but only saw what appeared to be a black female driving away in a red car. Otis Maxey testified that the Defendant drove a candy apple red Cadillac.

John Sykes, the victim's nephew, testified that he worked with Vernon Cox in September 1999. According to Mr. Sykes, the Defendant would visit Mr. Cox about three times a week primarily during lunch time.

Gloria Jean Sykes, the victim's niece, saw the Defendant at Wal-mart the Monday before the victim disappeared. Ms. Sykes overheard the Defendant telling someone that she and her husband were not getting along, that he was the reason she had to take her foster children back to Coushatta, and that she was going to have to get rid of him. The Defendant stated that she was going to get her children back and head to Texas.

James Rydberg testified that on December 14, 1998, the Defendant took out a $12,500.00 accidental death policy on the victim. During her testimony, the Defendant explained that she answered the phone when someone from JC Penney's called regarding the insurance policy, and she gave the necessary information since her husband could not hear very well and could not read or write. The Defendant submitted an accidental death claims form for the death of her husband and the Defendant inquired about the benefits in June 2000. Subsequently, the Defendant submitted a letter relinquishing her rights to the benefits and asked that her children receive the benefits.

Judge Jimmy Wiley testified that while he was practicing law, the victim executed a will in his presence on August 26, 1998. The will provided for the Defendant to be appointed as executrix of the victim's estate upon his death and also

13

provided for the Defendant to receive all of the victim's property. Judge Wiley testified that the Defendant sat in the waiting room while the will was executed.

The first witness to testify for the defense, Oscarine Watley, testified that the Defendant and the victim lived with her for about four months after they got married. Ms. Watley frequently saw the couple even after they moved out. When asked if she noticed any marital discord between the two of them, Ms. Watley replied, "No, nothing unusual."

The Defendant's brother, Reverend Elbert Demery, was asked by defense counsel if his sister ever told him that she and her husband, were having trouble. Reverend Demery replied, "Nothing major, you know, marriage. . . . disagreements that all marriages have." The reverend also testified that on the Thursday morning after the victim disappeared, his niece called to say someone was breaking into the Defendant's home. When the reverend arrived, he saw Mr. Cox driving off.

Quintretta Larry, the Defendant's daughter, testified that the victim told her he was going squirrel hunting on a Tuesday. She testified that the victim hit her mom once. According to Ms. Larry, the victim and Defendant otherwise got along fine.

Billy West, the attorney that handled the Defendant's divorce from Mr. Cox in 1998, stated that he could not serve Mr. Cox with the divorce papers because Mr. Cox was in a Texas penitentiary. He also testified that the Defendant was clearly trying to get away from Mr. Cox.

Susan Johnson Beaudion, an inmate at Avoyelles Parish Women's Correction Institute, testified that she knew Vernon Cox because he hung out on the streets. Ms. Beaudion was questioned about a statement she gave police and stated that she was possibly high on crack when she gave the statement. When cross-examined, Ms. Beaudion testified that she saw Mr. Cox on November 10, 1999 and he was acting weird. When Ms. Beaudion asked Mr. Cox what was wrong, he replied that he loved

14

the Defendant, that he missed her and that he would do what it took to get her back. At 12:30 in the morning, Mr. Cox made a phone call. A few minutes later, a candy apple red car pulled up and Mr. Cox got in. According to Ms. Beaudion, the car pulled off, Mr. Cox showed her $600.00 and asked where the good dope was.

The Defendant, Elbertine Sykes, testified on her own behalf. The Defendant was 40 and the victim was 76 when they married. When asked to describe her marriage to the victim, the Defendant stated that she did not have a problem with the marriage but strayed away from it when she started working. She also recounted an event wherein the victim struck her and tried to cut her with a pocket knife. Although her husband was taken to the police station, the Defendant refused to give a statement because she did not want him in jail. According to the Defendant, that was the only problem they had when they were married. The Defendant admitted that she and Otis Maxey had a relationship and would meet at a place she rented.

According to the Defendant's testimony at trial, she last saw her husband on Tuesday at 3:30 p.m., before she left to go to work. He told her he was going squirrel hunting the next day with one of his nephews. The Defendant denied giving shells to someone and denied having anything to do with her husband's murder. The Defendant also stated that she was not in a good financial condition as a result of her husband's death and that he was a good provider.

On cross, the Defendant denied having any knowledge before her husband's death that Mr. Cox might kill her husband. The Defendant acknowledged that she had stated such in her statement to police but maintained that her prior statement was not true. She explained her statement to police as follows:

> Because the conversation that I had uh. . . . with Mike Wilson when he brought me down to the uh . . . to his office to interrogate me. He told me state things where he had the recorder off. He and I had a conversation. And he told me if I didn't say that Vernon did it, because Vernon had made a statement that I did it, that I was going to get the

15

electric chair. And then [he] turned the tape recorder back on and taped what he wanted to hear.

The Defendant claimed that she and Detective Wilson talked for approximately two hours while the tape recorder was turned off. The Defendant stated that all of the statements she made concerning Mr. Cox were a lie and she was merely trying to protect herself. The Defendant also denied taking lunch to Mr. Cox three times a week and denied calling him every day. The Defendant claimed that Mr. Cox would call her concerning a daughter that they were raising together. She admitted that she did go see Mr. Cox in Houston with her family.

The Defendant denied asking Mr. Cox to kill her husband and denied ever putting poison in her husband's food. The Prosecutor showed the Defendant several letters written to Mr. Cox after the murder. The Defendant admitted that she wrote the letters even though they were signed, "Love, Marcus." The Defendant explained that her son would tell her things to write and she just signed her son's name while he was at work. The Defendant also admitted that in the letters she assured Mr. Cox that she would not testify against him. The Defendant explained, however, that she did not have any information with which to testify against him. The State questioned the Defendant about a statement she made in a letter written to Mr. Cox on October 3, 2000, wherein the Defendant said:

I love my husband, a lot. He tired [sic] to give me the world. I miss him dearly. I cry every night because I miss him so much. There never was a dull moment between us at all. He visit me in dreams. He love me and my children.

The Defendant was also questioned about a letter she wrote to Otis Maxey sometime before December 17, 1999 (the murder occurred sometime around November 10, 1999), wherein she said, "I cry every night. I really miss you. If I could only get a hug from you. God I miss you." She closed the letter with, "I love you Otis Love me back baby. Love Elbertine Sykes Soon to be your wife (smile)."

16

The court also notes that the Defendant told Mr. Maxey:

> I am so sorry about what I've gotten you into.  I now hated that I ask you to help me.  When I ask you that is because I had gotten a phone call telling me where the truck was and where I was suppose to take it.  They wanted to bring harm to my baby.  The person said that they was going to break my baby neck.  I was afraid for my children and my family because of what I know.

> Remember when we was at the apt.  and I kept telling you that something was wrong and I had a funny feeling.  Well this what was wrong all that done happen.

When asked at trial how she knew to take the truck "out there," the Defendant replied, "I didn't take the truck out there," and that she lied when she said she did.  The following colloquy took place concerning the truck:

Q. When you told Officer Wilson, that was a lie?

A. Yes.  I couldn't drive two (2) vehicles at the same time.

Q. Didn't Otis drive one?

A. I don't know if he . . . if he drive, I guess he could.

The Prosecution asked the Defendant about several phone calls that were made from her home and to her home on November 9.  The calls were made to and from the number at which Mr. Cox was residing at the time.  The Defendant claimed she was not at home when one of the calls was made and that the other calls could have been made and/or answered by someone else at her home.

In her brief, the Defendant claims the State failed to present any direct evidence (i.e., no eyewitness to the murder, no murder weapon, no fingerprints or other physical evidence linking the Defendant to the murder) of her involvement in the death of her husband.  The Defendant also argues that the circumstantial evidence failed to exclude every reasonable hypothesis of innocence.  One hypothesis of innocence argued by the Defendant is that one of the victim's nephews killed and robbed him.  Finally, the Defendant argues that the evidence failed to show she specifically intended to kill or

17

inflict great bodily harm upon her husband.

Although the Defendant is correct in that no evidence indicates she was the person who actually shot and killed her husband, we find the evidence was sufficient to convict the Defendant as a principal to the murder. Louisiana Revised Statutes 14:24 provides:

> All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

Considering the Defendant's own statements, this court finds there was sufficient evidence to show that Vernon Cox killed the Victim. The court further finds the evidence was sufficient to prove that the Defendant aided and abetted in the murder. The State presented evidence that the Defendant expressed dissatisfaction with her marriage, admitted to Otis Maxey that she tried to poison her husband's food, and asked Vernon Cox to kill her husband. The State also presented evidence that the Defendant and Vernon Cox were in frequent contact with one another prior to the murder and actually discussed Cox robbing the Victim. Although the Defendant claims she told Cox not to hurt her husband, she and Cox discussed where Cox would get the weapon. Phone records indicate that someone in the Defendant's home received and made phone calls to the number at which Vernon Cox was living immediately prior to and after the victim disappeared. Otis Maxey testified that the Defendant told him she was taking shells to Vernon. The Defendant then asked Maxey to help her take her husband's truck out to the murder site after her husband disappeared. She told Maxey that she had done something crazy and had "f___ed up." The Defendant also called the police with what she claimed was an anonymous tip that led the police to the Victim's body. Additionally, the defense presented no witnesses having knowledge of the nephew with whom the Victim was to go hunting.

18

Finally, we find the above evidence was sufficient to prove the Defendant specifically intended for Vernon Cox to kill or inflict great bodily harm upon the Victim. Accordingly, the court finds these assignments lack merit.

**ASSIGNMENT OF ERROR NUMBER ONE**

The Defendant claims the trial court erred in denying her request for a new trial based on new and material evidence. In the motion, the Defendant asserted the following:

> On July 23, 2002 (6 days after the verdict of guilty on July 18, 2002), Oscar Rene Whately [sic] received a phone call. The caller said: I'm Chris Williams. I'm the one who killed William Sykes not Elbertine. Reverend Elbert Demery reported it to Travis Tremble.

At the hearing on the motion for new trial, defense counsel orally asserted the call of Chris Williams as a ground for new trial but offered no supporting evidence. The trial court denied the motion.

Louisiana Code of Criminal Procedure Article 851 provides in pertinent part:

> The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegation it is grounded.

> The court, on motion of the defendant, shall grant a new trial whenever:
> . . . .

> (3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty....

The supreme court recently stated the following regarding the proof necessary for the granting of a motion for new trial:

> Thus, a new trial shall be granted based on Article 851(3) when: (1) new evidence was discovered after trial; (2) the new evidence is material; (3) the failure to discover the evidence was not due to a lack of

19

diligence on the part of the defense;  and, (4) had the evidence been introduced, the verdict or judgment of guilty probably would have been changed.  *See State v. Cavalier*, 96-3052, 97-0103, p. 3 (La.10/31/97), 701 So.2d 949, 951;  *State v. Hammons*, 597 So.2d 990, 994 (La.1992); *State v. Knapper*, 555 So.2d 1335, 1339 (La.1990).

*State v. Watts*, 00-602, p. 6 (La. 1/14/03), 835 So.2d 441, 447.

This court finds the Defendant in the present case failed to satisfy her burden of proving the necessity of a new trial, and the trial court did not err in denying her motion.  First, although it appears that Chris Williams' statement that he killed the victim was not discoverable prior to or during trial even with reasonable diligence, the Defendant failed to present evidence to prove such.  Defense counsel simply argued to the court that the call came after the verdict and "out of the blue."   Second, the court finds the Defendant has failed to prove that such evidence would have been admissible at trial and thus would have probably changed the jury's verdict.  First, the Defendant has not stated who would testify as to the new information, i.e., whether Ms. Watley would testify as to such evidence or whether Mr. Williams would be willing to testify against himself.  Since the Defendant offers no evidence of the latter, the court assumes  Ms. Watley would be called to testify.  If the Defense presented Ms. Watley to testify as to Mr. Williams' statement, Ms. Watley would be testifying to a hearsay statement against interest.  Louisiana Code of Evidence Article 804(B)(emphasis added) provides in pertinent part:

> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>     . . . .
>     (3) **Statement against interest.**  A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. *A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.*

Article 804 defines unavailability as "when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court." The article provides several examples of unavailability, including: "Is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement...." The Defendant in the present case must first show Mr. Williams is unavailable to testify. Assuming Mr. Williams claims his privilege not to testify and is unavailable, the Defendant must also offer "corroborating circumstances clearly indicat[ing] the trustworthiness of the statement." La.Code Crim.P. art. 804(B)(3). In *State v. Hammons*, 597 So.2d 990 (La.1992), the supreme court explained the history behind the federal rule pertaining to a statement against interest, after which Article 804(B)(3) is closely patterned. The court stated, "[B]ecause of the traditional suspect nature of admitting statements by a third-party that exculpate an accused, the federal rules specifically prohibited admission of these statements unless the declarant is unavailable and corroborating circumstances clearly indicate the trustworthiness of the declaration." *Id.* at 996.

No evidence of corroborating circumstances has been introduced by the Defendant to prove the trustworthiness of Mr. Williams' alleged declaration. Thus, we find the Defendant has failed to prove Mr. Williams' statement would be admissible at trial if offered via Ms. Watley's testimony. Additionally, as stated earlier, the Defendant has offered no proof that Mr. Williams would be willing to testify against himself. Accordingly, we find this assignment lacks merit.

**ASSIGNMENT OF ERROR NUMBER TWO**

The Defendant claims the trial court erred in denying her request for a new trial based on improper remarks made by the State in its closing argument. During its closing argument, the Prosecution explained the law of principals as follows:

In Louisiana, all persons concerned in the commission of a crime

21

whether present or absent, doesn't matter. Whether they directly commit the act constituting the offense pulling the trigger, aide and abet, take shells, ask him to kill him, take the vehicle out there or directly or directly counsel or procure another to commit. Vernon, I want you to kill my husband. The crime, they are principals. It's just like 911, who do you punish? The pilot of the plane? You also punish who's just as guilty, the people that set up the catastrophe. Those that planned it, those that helped them that helped the pilots, they're just as guilty. Same thing here.

In brief, the Defendant claims these comments were prejudicial because they were made less than a year after the attacks on the World Trade Center and they were made while the United States was preparing for a war in retaliation of the terrorist attack. The Defendant claims the Prosecutor could have used a less egregious example that would not have enraged the passions of the jury.

Although the Defendant alleged the above comment as erroneous in her motion for new trial, the Defendant failed to contemporaneously object when the comment was made. La.Code Crim.P. art. 841. There is a question, however, as to whether the issue was revived by its allegation in the Defendant's motion for new trial. This court has stated the following regarding this issue:

> Based on our review of the jurisprudence, whether Defendant's Motion for New Trial preserved the issue for appellate review is not settled law. The first circuit has stated squarely that a motion for new trial does not preserve or revive an issue that was not preserved via contemporaneous objection. *State v. Moody*, 00-886 (La.App. 1 Cir. 12/22/00), 779 So.2d 4, *writ denied*, 01-0213 (La.12/7/01), 803 So.2d 40. The second and fourth circuits have taken a similar view. *State v. Lowery*, 33,905, 33,906 (La.App. 2 Cir. 2/28/01), 781 So.2d 713; *State v. Green*, 98-912 (La.App. 4 Cir. 9/9/98), 731 So.2d 286, *opinion reinstated on rehearing*, 98-912 (La.App. 4 Cir. 12/9/98), 731 So.2d 298, *writ denied*, 99-0043 (La.5/7/99), 741 So.2d 28. We have voiced a similar approach, but proceeded to a brief review of the merits. *State v. Corley*, 97-235 (La.App. 3 Cir. 10/8/97), 703 So.2d 653, *writ denied*, 97-2845 (La.3/13/98), 712 So.2d 875. The fifth circuit appears to have taken the opposite approach when it treated a new-trial motion as preserving or reviving an issue that had not been preserved via trial objection. *State v. Richthofen*, 01-500 (La.App. 5 Cir. 11/27/01), 803 So.2d 171.
>
> In our opinion, a motion for new trial does not preserve or revive an issue not properly and timely raised by objection. This is true because, by the time a new-trial motion is made, the trial court has lost

22

its best opportunity to correct the error at issue. However, as in *Corley*, we will address the constitutional right to silence issue in light of the jurisprudence cited above.

*State v. Marcotte*, 01-1586, pp. 6-7 (La.App. 3 Cir. 5/15/02), 817 So.2d 1245, 1249-50, *writ denied*, 02-1687 (La. 2/7/03), 836 So.2d 96.

Likewise, this court finds the motion for new trial filed in the present case did not preserve the Defendant's claim regarding the State's 9/11 comment. However, even if this court finds the claim was preserved by the Defendant's motion for new trial, we find the Defendant has failed to prove that the comment warrants a new trial. We find the Defendant has failed to show that the Prosecutor's remarks "so influenced the jury as to undermine the reliability of the jury's verdict." *State v. Deruise*, 98-0541, p. 23 (La. 4/3/01), 802 So.2d 1224, 1241, *cert. denied*, 534 U.S. 926, 122 S.Ct. 283 (2001).

## ASSIGNMENT OF ERROR NUMBER FIVE

By this assignment, the Defendant claims the trial court improperly instructed the jury as to the definition of the responsive verdict of manslaughter. The Defendant claims the definition given is incorrect for two reasons. First, she claims the trial court "failed to explain, include, or define the references in the definition of manslaughter to the offenses of first degree murder or second degree murder and especially to the enumerated felonies therein." Secondly, the Defendant claims "the trial court mis-defined those felonies which can form a basis for the offense of manslaughter by completely omitting the reference to 'enumerated felonies' and just referring to 'a felony.'" As a result, the Defendant claims, the jury was unable to adequately consider manslaughter as a responsive verdict.

We find the Defendant failed to preserve this issue for appeal by failing to object at trial. On the final day of trial, the court asked the parties if they had a chance to review the jury instructions. The State responded that it had reviewed the instructions and that it had two comments. After the State announced its objection to

23

one of the jury instructions, the following colloquy took place regarding the jury instruction on manslaughter:

> MR. CREWS [Prosecutor]: The other thing dealt with the Manslaughter charge at the end.
>
> THE COURT: Yes sir.
>
> MR. CREWS: The second part of Manslaughter deals with other felony's not enumerated and I was, I saw no relevancy to that. (Inaudible conversation between parties).
>
> THE COURT: So Mr. Crews, you're suggesting not that we eliminate all of that paragraph, but simply say when the offender is engaged in the perpetration or attempted perpetration of any felony?
>
> MR. CREWS: That's correct, Your Honor.
>
> THE COURT: Alright.
>
> MR. WHITEHEAD [Defense counsel]: That's all I have.
>
> MR. CREWS: There's been no evidence on anything else.
>
> THE COURT: Right, so other than that you have no objection. Mr. Whitehead?
>
> MR. WHITEHEAD: No sir I don't have any objections to it Judge. . . . My theory about the jury instructions has about much effect on me as a warranty deal (sic).

The jury instructions were not discussed further. Thus, we find that defense counsel not only failed to object to the manslaughter instruction but consented to the instruction. Accordingly, the court finds the Defendant is precluded from alleging error in the instruction on appeal. La.Code Crim.P. art. 841.

The Defendant alleges that the erroneous manslaughter instruction was "exacerbated" by the Prosecutor's last statement in his closing argument wherein he stated that the "only possible scenario is a guilty verdict of Second Degree Murder." Again, no objection was made to the Prosecutor's comment nor the jury instruction. Additionally, the court finds the Prosecutor's comment was within the proper scope of closing argument.

For the foregoing reasons, this assignment lacks merit.

## ASSIGNMENT OF ERROR NUMBER SIX

The Defendant claims the trial court allowed the State to make improper arguments during closing argument and these arguments denied the Defendant her right to a fair trial. The Defendant claims the State was allowed to argue facts not in evidence, express personal opinions, and testify concerning the finding of a white sweater near the body. Specifically, the Defendant refers to a comment made by the State regarding the finding of a white sweater that was not at the murder scene the day before. The Defendant claims this statement was inaccurate because the evidence "[a]t best . . . support[s] a conclusion that the white sweater was not found the previous day." "This inaccurate misstatement of the facts," the Defendant claims, "was used by the State to support a theory that the sweater was placed there the next day by Appellant."

Because the Defendant failed to object to the State's "white sweater" argument, we find she is precluded from alleging any error on appeal. La.Code Crim.P. art. 841; *State v. Bridgewater*, 00-1529 (La. 1/15/02), 823 So.2d 877, *rehearing granted on other grounds*, (La. 6/21/02), 823 So.2d 877, *cert. denied*, __ U.S. __, 123 S.Ct. 1266 (2003). Furthermore, this court finds the State's comments were not improper and were within the scope of closing argument. During his trial testimony, Detective Wilson stated that when they searched for the victim's body the second time, a white sweater was found. Detective Wilson also stated that the sweater was not there the day before. When asked if someone put the sweater there after the previous search, the detective replied, "Yes, sir."

Additionally, the Defendant claims the Prosecutor improperly "testified" before the jury when he stated that he was a squirrel hunter and that squirrel hunters do not wear white sweaters when they go squirrel hunting. Again, the court finds the

25

Defendant is precluded from alleging this error as defense counsel failed to lodge an objection at trial. La.Code Crim.P. art. 841. Accordingly, the court finds this assignment lacks merit.

## ASSIGNMENT OF ERROR NUMBER SEVEN

The Defendant claims the trial court erred by allowing the Prosecutor to imply that defense counsel was not "playing by the rules." The Defendant explains that during the State's opening statement, defense counsel entered an objection that was overruled by the trial court. Because the objection was not heard by the court reporter, it was not transcribed. When he resumed his argument, the Prosecutor stated:

> I'm sorry ladies and gentlemen, you will find out during the course of the trial, attorneys will object for various reasons. Uh . . . there are certain rules of the game we are suppose to play by, and some of the attorneys disagree on what the rules are. And for that reason they may enter objections. The Judge, not the jury, thankfully, has to decide who's playing by the rules, and who isn't.

Because the Prosecutor's comment immediately followed the trial court's overruling of an objection made by defense counsel, the Defendant claims the Prosecutor implied that defense counsel was not playing by the rules. This point, the Defendant claims was "driven home each time during the trial when an objection by defense counsel [was] overruled (or an objection by the State [was] sustained)." The Defendant further argues that this statement, "impugns the dignity, honesty, and trustworthiness of defense counsel and defendant. It is an improper appeal to passion to the jury."

As with the Defendant's allegations of error during the State's closing argument, we find the Defendant is precluded from alleging the above comment was improper since defense counsel failed to raise an objection to the comment. La.Code Crim.P. art. 841. Furthermore, the court finds the Defendant has failed to prove any improper implication from the comment.

Finally, the Defendant also claims in this assignment that "[t]his error is one of

26

a series of improper statements by the Prosecutor which, in total impinge upon Appellant's right to a fair trial . . . . The cumulative effect is that the jury is influenced to react emotionally in a negative manner to the defense." The Defendant fails to specify the other improper statements made by the Prosecutor and fails to substantiate her claim that the statements impinged upon her right to a fair trial by causing the jury to react negatively to the defense.

For the foregoing reasons, this assignment lacks merit.

### ASSIGNMENT OF ERROR NUMBER EIGHT

The Defendant claims the trial court erred in allowing the jury to review two audiotape transcripts when the trial court found the transcripts were not admissible. During the trial, the State sought to introduce both the audiotape and the transcript of the phone call made by the Defendant to report her husband's disappearance. Defense counsel objected to the introduction of the transcript, arguing that the tape was the best evidence of the conversation. Specifically, defense counsel argued:

> Your Honor, I'm going to object. The best evidence is this lady's testimony. What Mr. Crews is trying to do is sneak under the carpet a written statement so the jury can get it back in to the jury room. And they are entitled to that. This tape right here is actually the best evidence of the conversation. Because I know [Defendant] doesn't remember what all went on, I want to be fair with her about it. But definitely not the written statement . . . . the transcription of the tape.

When the court asked the Prosecution to state the purpose of the transcript, the Prosecution replied:

> My intention is to give it to the juror with the intention of letting them read along as the tape is being done. It really is all . . . I found that to be very, very helpful in following what the and following what the actual conversation really is. It's been told to be an accurate reflection. We don't need to put the actual transcript in if that poses a problem, Mr. Whitehead, the jury can just read the transcript.

The following colloquy ensued:

> MR. WHITEHEAD: I still say you can't get her testimony in . . . a transcript of the statement, and at the same time play the tape of what's

27

on the recording. That's three shots at the apple and it's just not correct.

MR. CREWS: Your Honor, this was all done in a Motion before Your Honor. And Your Honor allowed . . . . this is already in the record. Your Honor, allowed the transcriptions in, with instruction to Mr. Whitehead, that if he determines any difference between the tape and the transcript to let Your Honor know. So, all this has been covered.

THE COURT: I . . . I . . . I do remember that . . . .

MR. WHITEHEAD: But . . . .

THE COURT: . . . Mr. Whitehead.

MR. WHITEHEAD: . . . it wasn't offered at trial in this fashion and for what purpose, Judge.

THE COURT: Mr. Crews is the tape difficult to understand[?]

MR. CREWS: There . . . . there are some parts of it . . . yes, Your Honor that makes it easier, uh . . . and I'm going to do it with her statements as well, and it's the same situation there, it's just easier to understand.

MR. WHITEHEAD: Is Mr. Crews going to let her read it to?

THE COURT: I . . . I . . . no.

MR. WHITEHEAD: No.

THE COURT: You are going to play the tape . . . .

MR. CREWS: I'm going to play the tape and give the transcript to the jury.

THE COURT: Well, I see no harm in that.

MR. WHITEHEAD: Well, I object to it, Your Honor.

THE COURT: Certainly, and it's noted for the record.

Copies of the transcript were distributed to the jurors, and the jurors read along as the tape was played. The State formally offered both the transcript and the audiotape. Defense counsel objected to the admission of the transcript because the tape was the best evidence and the court responded: "I agree, Mr. Crews . . . uh . . . we got . . . and we just . . . they just listened to it. They were able to read . . . you said earlier, all you wanted to do was to be able to follow along." The State proffered the transcript as S-2

28

and the court allowed the proffer.

Later during Detective Wilson's testimony, the State offered S-15, an audiotape of an interview with the Defendant. Defense counsel objected to the jury following along with the transcript when the tape was being played for them. The following colloquy ensued:

> MR. CREWS: Same scenario as a while ago, I won't introduce the transcript, but for their ease I'll put the transcript in on (inaudible, not speaking loud enough in to the microphone).
>
> THE COURT: Have you had an opportunity to review the transcript, Mr. Whitehead? And is it . . . .
>
> MR. WHITEHEAD: Both of them.
>
> THE COURT: Is it an accurate reflection of the recording?
>
> MR. WHITEHEAD: As best I recall.
>
> THE COURT: Then I see no harm in it, and I will allow it.

Once again, copies of the transcript were distributed to the jurors and the jurors read along as the tape was played. The State proffered the transcript, and the court accepted the proffer. In essence, the Defendant argues:

> In both instances what happened was that the trial court ruled that the transcripts were not admissible yet permitted the jury to read them. This contradictory stand permitted the jury to see and view that of which it should not have. In both cases, defense counsel objected to the jury reading the transcripts.
>
> By permitting the jury to see the transcripts prepared by the State, it gave the Prosecution the added advantage of "interpreting" difficult to understand audiotapes in a manner favorable to the State. Not only were the actual audiotapes played for the jury, but the witnesses who were recorded on the tapes were present to testify. The transcripts gave an unfair advantage to the State to present it's [sic] "version" of what was said when, in fact, better evidence was available. Although the trial court originally ruled correctly that the transcripts should not be admitted, that ruling was undone by permitting the jury to read the transcripts and receive an extra dose of the "spin" on the facts by the State.
>
> This tactic denied Appellant her right to a fair trial as guaranteed

to her by the Louisiana Constitution of 1974, Article 1, §16 and by the Sixth Amendment of the United States Constitution.

We find the Defendant's argument may be interpreted as a claim that the trial court erred in allowing the jury to review material that was not admitted into evidence. We find the Defendant did not specifically express this objection at trial and is precluded from raising this claim on appeal. La.Code Crim.P. art. 841. However, because this court finds defense counsel covered this claim in his argument to the trial court, we address its merits.

We find *State v. Graham*, 422 So.2d 123 (La.1982), *appeal dismissed*, 461 U.S. 950, 103 S.Ct. 2419 (1983), is factually distinguishable but nevertheless analogous. In *Graham*, several jurors performed a blood coagulation experiment during their deliberations. Thus, they considered evidence that was not introduced at trial. The supreme court found, however, that the error was not reversible because there was no "reasonable possibility that the juror's experiment affected the verdict." *Id.* at 131. This court finds there is no reasonable probability that the jury's reading of the transcripts in the present case affected its verdict. There is no allegation that the transcript was different or inconsistent with the tape.

Furthermore, the supreme court has held that a "transcript of a tape [is] admissible over a best evidence objection, since the transcript provide[s] the jury with a convenience in following the playback of the tape." *State v. Burdgess*, 434 So.2d 1062, 1066 (La.1983)(citing *State v. Snedecor*, 294 So.2d 207 (La.1974). Thus, the trial court in the present case could have properly allowed the introduction of the transcripts into evidence. The Defendant cites no authority nor does the jurisprudence appear to support a finding that allowing the jury to read along while the tape was being played allowed the State to give the jury an "extra dose" of its version of the case. The jury was not able to view the transcripts during deliberations. Finally, since

30

the defense counsel does not specifically allege any inconsistencies between the transcripts and the audio-tapes, we find defense counsel has failed to prove that the transcripts provided the jury with an erroneous interpretation of the tapes. Accordingly, this assignment lacks merit.

## CONCLUSION

The Defendant's conviction and sentence are affirmed.

**AFFIRMED.**

31