701 So.2d 949 (1997)
STATE of Louisiana
v.
Cornell B. CAVALIER.
Nos. 96-K-3052, 97-KH-0103.
Supreme Court of Louisiana.
October 31, 1997.
*950 Dwight M. Doskey, New Orleans, for Applicant in Nos. 96-K-3052, 97-KH-0103.
Cornell B. Cavalier, pro se in No. 97-KH-0103.
Richard P. Ieyoub, Attorney General, Harry F. Connick, Joseph E. Lucore, New Orleans, for Respondent in Nos. 96-K-3052, 97-KH-0103.
PER CURIAM.[*]
We granted relator's application to review the denial of his motion for a new trial on grounds of newly discovered evidence which, relator argues, serves as the litmus test of the victim's credibility at trial. The trial court denied the motion on grounds that "the jury believed [the victim's] story about what happened," and the court of appeal affirmed upon finding that the evidence, consisting of the victim's employment records from Oschner Hospital in New Orleans, did not create a probability of a different verdict and that, in any event, relator had failed to exercise due diligence to secure the evidence before or during trial. State v. Cavalier, 95-2665 (La.App. 4th Cir. 11/20/96), 684 So.2d 90. We reverse and remand for retrial of the motion.
Relator was convicted of carjacking in violation of La.R.S. 14:64.2. The jury's verdict resolved sharply conflicting versions given by the victim, Cindy McDuffie, and relator, of their encounter over the Mardi Gras weekend in 1995. McDuffie testified that on the morning of February 26, 1995, the Sunday before Mardi Gras, relator accosted her in the parking lot of a convenience store, reached into her car, punched her in the jaw, grabbed for her keys and climbed into the vehicle as she got out. Acting on information provided by a bystander who identified her assailant as a man named Brian, McDuffie and the police officer who responded to her report canvassed the area and found relator asleep in McDuffie's car parked across from *951 his mother's home. Relator awoke to find himself under arrest. Relator, on the other hand, told jurors that he had in fact met McDuffie on Saturday and spent the night out with her "getting high." He then borrowed her car on the following morning to buy something more to drink, only to pass out in the vehicle before completing the errand. According to the investigating officer, McDuffie gave yet another account of the incident on the scene, claiming that an individual known to her as Brian had flagged her down and dragged her from the car, and that he had then driven away in the direction of his mother's home.
The prosecutor first interjected the question of McDuffie's employment during his cross-examination of relator when he challenged relator to respond "to the fact that she worked all night." Relator replied that "it wouldn't be possible. The proof is in the pudding.... If she was working then evidently I am lying but I know I was with her." On rebuttal, the state recalled the victim, who told jurors that she had been employed at Oschner Hospital and had been at work for the entire night of February 25, leaving for home on the following morning at approximately 7:00 a.m. During closing argument, the prosecutor invited jurors to compare the competing accounts given by the victim and relator and to consider that on the one side, "we have the victim employed by Ochsner working a night shift not drinking.... Working during Mardi Gras supporting herself," and on the other side, "this gentleman here [who] drinks every day [and] loves to get high with his friends ... partying on Mardi Gras."
In response to a subpoena duces tecum issued by the court after trial, defense counsel obtained records from Oschner Hospital purporting to show that the victim did not work at the hospital on either February 25 or 26, 1995; that Oschner had extended an initial 90-day employment probation period for 30 days because of excessive absenteeism; and that she had then quit without notice in May of 1995. The records are not certified and it is not clear from the transcript of proceedings on August 20, 1996, whether defense counsel formally introduced them into evidence, although the documents appear in the record on appeal and the trial court had the opportunity to review them before ruling on the motion for a new trial.
A defendant seeking a new trial based on newly discovered evidence must establish four elements: (1) that the new evidence was discovered after trial; (2) that failure to discover the evidence before trial was not attributable to his lack of diligence; (3) that the evidence is material to the issues at trial; and (4) that the evidence is of such a nature that it would probably produce a different verdict in the event of retrial. State v. Hammons, 597 So.2d 990, 994 (La.1992); State v. Knapper, 555 So.2d 1335, 1339 (La. 1990); State v. Prudholm, 446 So.2d 729, 735 (La.1984). In ruling on the motion, "[t]he trial judge's duty is not to weigh the evidence as though he were a jury determining guilt or innocence, rather his duty is the narrow one of ascertaining whether there is new material fit for a new jury's judgment." Prudholm, 446 So.2d at 736.
Newly discovered evidence affecting only a witness's credibility "ordinarily will not support a motion for a new trial, because new evidence which is `merely cumulative or impeaching' is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial." Mesarosh v. United States, 352 U.S. 1, 9, 77 S.Ct. 1, 5, 1 L.Ed.2d 1, 5 (1956). Nevertheless, the court possesses the discretion to grant a new trial when the witness's testimony is essentially uncorroborated and dispositive of the question of guilt or innocence and it "appears that had the impeaching evidence been introduced, it is likely that the jury would have reached a different result." United States v. Davila, 428 F.2d 465, 466 (9th Cir.1970); accord United States v. Davis, 960 F.2d 820, 825 (9th Cir.), cert. denied, 506 U.S. 873, 113 S.Ct. 210, 121 L.Ed.2d 150 (1992); United States v. Taglia, 922 F.2d 413, 415-16 (7th Cir.1991); United States v. Harpster, 759 F.Supp. 735, 738 (D.Kan.), aff'd 951 F.2d 1261 (10th Cir.1991); United States v. Lipowski, 423 F.Supp. 864, 867 (D.N.J.1976); see also State v. Bryan, 398 So.2d 1019, 1021-22 (La.1980) (on rehearing). In making this determination, the *952 court may assume that the jury "would have known that [the witness] had lied about the matter[.]" United States v. Stofsky, 527 F.2d 237, 246 (2nd Cir.1975), cert. denied, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976).
We need not decide at this point whether evidence that the victim had lied about her whereabouts on the night of February 25, 1995, would so devastate the credibility of her testimony that the jurors, with knowledge of the contradiction and acting under an instruction from that court which permitted them to reject in its entirety the testimony of any witness whom they believed had "willfully and deliberately testified falsely to any material fact," probably would have reached a different result. That determination is for the trial court in the first instance. Bryan, 398 So.2d at 1022. We are, however, satisfied that the evidence is sufficiently probative of the victim's credibility to justify another hearing on relator's motion. Under the proper standard for ruling on the motion, the trial court must determine not simply whether "the state's evidence, despite the contradictions and discrepancies, was sufficient to support the conviction against a challenge to sufficiency under the standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)," but instead whether the evidence presented at trial appears strong enough "to support a conclusion that the newly discovered evidence probably would not have changed the verdict, when one considers the newly discovered evidence that would be presented at a new trial." Hammons, 597 So.2d at 999.
We are also satisfied that the failure of relator's appointed attorney to obtain the records before or during trial did not reflect a lack of diligence. When counsel first asked the victim on cross-examination during the state's case in chief where she had spent the night of February 25, the trial court sustained the state's objection. The existence of the Oschner employment records became relevant only after relator testified and after the victim returned to the stand in the state's rebuttal case at the end of the one-day trial and just before closing arguments. At that point, defense counsel had no basis for asking the court to recess trial and to send jurors home for however long it would take to secure the Oschner records the defense had never seen, in anticipation that they had been kept and checked "with a degree of habit, system, regularity and continuity" sufficient to constitute reliable evidence despite their hearsay nature, State v. Perniciaro, 374 So.2d 1244, 1247 (La.1979); see La.C.E. art. 803(6), and that they would justify a surrebuttal the court had no duty to grant in the absence of a particularized and compelling showing that critical exculpatory evidence would otherwise be withheld from the jury. State v. Harper, 93-2682 (La.11/30/94), 646 So.2d 338, 342; State v. Harrison, 553 So.2d 422 (La.1989). Under these circumstances, the failure to discover the records earlier or to request a recess did not constitute a lack of due diligence. See State v. Shannon, 388 So.2d 731, 736-37 (La.1980).
The judgment of the Fourth Circuit is therefore reversed and this case is remanded to the district court for retrial of the motion to determine if (1) the evidence is admissible and (2) probably would have changed the verdict. Relator may appeal again from an adverse ruling.
JUDGMENT REVERSED; CASE REMANDED.
NOTES
[*] Marcus, J., not on panel. See Rule IV, Part II, Section 3.