PER CURIAM.
12Derrick Maise, Brett Ward, Clayton James King, and Michael Ayo, defendants in these consolidated applications, were each charged by grand jury indictment with one count of aggravated rape, in violation of Louisiana Revised Statute 14:42, and one count of attempted aggravated rape, in violation of Revised Statutes 14:27 and 14:42. Both of these counts stem from an incident involving R.P., who was a 15-year-old juvenile at the time, which oc *601 curred in the home of Ward in St. Tammany Parish on the night of June 20, 2008. At the time, defendants ranged in age from 18 to 24 years. Defendants were tried together and were convicted by the vote of ten members of a twelve .member jury. The trial court sentenced all defendants to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence for the aggravated rape count. In addition, the trial court sentenced Ward, King, and Maise to a concurrent term of 30 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence for the attempted aggravated rape count. On that count, Ayo received a concurrent sentence as a second felony offender of 50 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendants appealed separately, and the First Circuit Court of Appeal affirmed their convictions and sentences in separate unpublished split-panel decisions, issued by the same panel on the same day.[1] Defendants filed separate applications in this Court seeking review of the decisions below. Because we find the District Court erred in denying defendants’ second supplemental motion for a new trial, we reverse the decisions below, vacate defendants’ convictions and sentences, and remand for a new trial.
lain order to understand the District Court’s error, it is necessary to wade through the complex and often contradictory facts of this case, keeping in mind that the State’s entire case against these defendants critically hinged on the ever-evolving testimony of the victim-witness, R.P, which was initially undermined but eventually corroborated in some respects by the testimony of her former female best friend, A.L., whose version of events seismically changed overnight during her second day on the witness stand. Essentially, according to R.P.’s trial testimony, after making a plan to spend the night at the home of A.L.’s female friend, Devon Radecker, R.P. and A.L. went with Ayo and Maise to pick up marijuana and alcohol before heading to Ward’s residence in Covington where they met King, Radecker, and some other female friends. While Radecker and the other female friends left Ward’s home to purchase food and more beverages, R.P. stayed behind with A.L. The girls were lying on a bed watching television in a bedroom of Ward’s home when all four defendants entered the room and locked the door behind them. At trial, R.P. testified that defendants then stripped down, and Ayo and A.L. began having consensual sex. Meanwhile, R.P. testified, King and Ward held R.P. down, and Ward began hitting her with his fists in her abdomen. R.P. further testified that Maise got between her legs, removed her pants, stuck his fingers in her vagina, then masturbated briefly to obtain an erection before putting his penis in her vagina. R.P. maintained that Ward continued to beat her with his fist while King repeatedly thrust his penis in R.P.’s face in what she took was a demand for oral sex. At this point, R.P. testified that Ayo and A.L. took a break. After announcing that he wanted “some of that,” Ayo allegedly pushed Maise aside and placed his penis in R.P.’s vagina. R.P. testified that she resisted as best she could, yelled out repeatedly for them to stop, and entreated A.L. to help her out. *602 A.L. had, however, consumed so much alcohol and drugs that she was in “her own world” as she was having sex with Ayo and did not respond, other than Uto advise R.P. at one point that “it would be okay and [she] wasn’t going to get hurt.” The incident ended when Radecker and her Mends returned and began knocking on the locked bedroom door.
We emphasize that this was R.P.’s version of events at trial because, as the First Circuit acknowledged, R.P. repeatedly denied experiencing sexual penetration — an essential predicate of the underlying offense of aggravated rape — for more than a year after her initial disclosure of the incident. The details of the incident evolved from iteration to iteration during a conversation with A.L.’s Mend, Radecker, as they sat outside Ward’s residence on the night of the incident. At trial, Radecker testified that during this conversation R.P. volunteered four different versions of the events that unfolded behind the closed doors of the bedroom that evening. First, R.P. told Radecker that A.L. had had sexual intercourse with all four defendants in her presence. After leaving Ward’s residence with Radecker and her Mends, R.P. then informed Ra-decker that she herself had been raped four times by another male in an entirely unrelated incident and repeated her claim that A.L. had had sex with all four defendants in her presence; R.P. then told Radecker that the defendants had beat her. “[T]he last story she told me,” Ra-decker recalled, “was that they beat her, raped her, and that [A.L.] helped.”[2] Because Radecker did not know R.P. well, she was puzzled as to why R.P. would confide in her. After making these varied disclosures to Radecker, R.P. consistently maintained for over a year that she was not sexually penetrated by the defendants. Indeed, in statements to St. Tammany Parish officers at a hospital on June 25, 2008 — where R.P. was taken after reporting to her mother that defendants had tried to rape her while, according to this version of R.P.’s story, A.L. held her down, leaving her bruised all over her body — and again on [ ^September 19, 2008, R.P. denied that she was sexually penetrated by any of the defendants. In the September interview, R.P. alleged for the first time the attempted act of oral sex which she then attributed to Ayo, not to King. In a series of photographic lineups conducted by Detective Schulkens on June 30, 2008, R.P. again made no mention of penetration in the notes that she made as she viewed the pictures, indicating that King had hit her all over and tried to take her clothes off, as did Ward and Maise, that Ayo had sex with A.L., and that A.L. had held her down and told her to go along with all of it. R.P. repeated her denials of penetration in interviews conducted at the Children’s Advocacy Center on July 2, 2008, by JoBeth Rickies, and at the Audrey Hepburn Care Center on July 29, 2008, by Dr. Adrienne Atzemis.
Finally, over a year after the incident, R.P. changed her story again, telling her mother that in fact she had been raped— that is, sexually penetrated — that evening. R.P.’s mother immediately sought out the St. Tammany Parish District Attorney’s Office.[3] Indictment of defendants for ag *603 gravated rape and attempted aggravated rape followed in May 2011.[4]
At trial, the defense introduced testimony from Megan Perkins (“Megan”) that five or six days before the incident she had been riding in a four-wheeler with R.P. when the vehicle hit a mound of dirt and overturned, spilling them onto the ground. Megan sustained a large bruise on the left side of her rib cage but did not observe any visible injuries to R.P., although R.P. had hit both of her hips and her lower abdomen on the handle bars when the vehicle flipped on its side.[5] Megan also testified that at approximately 2:00 a.m. on the morning of June 21, 2008, or | ¿just after the incident at Ward’s home, R.P. called to inform Megan that she had been at a party and that A.L. and Ayo had had sex. During this call, R.P. said nothing about an assault, sexual or otherwise, on herself. Megan Perkins passed this information on to her older sister, Shelby Perkins, the mother of Ayo’s child, who became extremely upset and who contacted R.P. about the incident after the arrests of defendants. Shelby Perkins testified that R.P. informed her A.L. had had sex with Ayo but again made no claim she had been raped and beaten at the same time.
Although there are glaring inconsistencies between R.P.’s prior statements and her testimony at trial, R.P.’s trial testimony was not completely uncorroborated. The caliber of that corroboration, however, left much to be desired. After receiving a grant of transactional immunity from the State, A.L. testified that while she and Ayo were having sexual intercourse in Ward’s bedroom, R.P. and King appeared getting “ready to do something,” but she did not know “if they did.” The other defendants — Ward, King, and Maise — were present but they and R.P. remained clothed. A.L. testified that the only non-consensual sexual activity that took place was when Ward demanded oral sex from A.L. Although A.L. related this version of the facts to the jury after she had received immunity from the State, A.L. changed her testimony following an overnight recess and the court’s appointment of an attorney to represent her after the State indicated it would impeach its own witness with a prior statement she gave to Detective Schulkens. A.L. then informed jurors that while she engaged in sex with Ayo, both King and Maise got between R.P.’s legs after her pants had been removed. From the way they moved they appeared to engage in vaginal sex with |7R.P., as did Ayo after he stopped having sex with her, while R.P. was calling out AL.’s name and pleading for defendants to stop.[6]
*604 Against this backdrop, the First Circuit found there was sufficient evidence to sustain the convictions because it could not say “that the jury’s determination was irrational under the facts and circumstances presented to them.... Herein, R.P.’s trial testimony clearly indicated that she was subjected to digital and penile/vaginal penetration by Maise and Ayo while being held down and beaten by [King] and Ward, and that [King] was attempting to force her to perform oral sex by putting his penis up to her face.”[7] The First Circuit found that, whatever the defendants’ particular role was in the incident, the evidence supported the jury’s finding that all foui' defendants had acted in concert and were, therefore, principals in the vaginal rape of R.P. by Maise and Ayo and the attempted oral sexual intercourse of R.P. by King.[8] Given the extent to which jurors had been exposed to the various prior and inconsistent accounts of the incident by R.P., yet still found R.P.’s trial testimony credible, the First Circuit majority found no error in the trial court’s denial of a new trial based on further newly discovered revelations of inconsistent statements made by R.P. and by A.L. We disagree.
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion 1 sshall be denied, no matter upon what allegations it is grounded.[9] A defendant seeking a new trial based on newly discovered evidence must establish four elements: (1) that the new evidence was discovered after trial; (2) that failure to discover the evidence before trial was not attributable to his lack of diligence; (3) that the evidence is material to the issues at trial; and (4) that the evidence is of such a nature that it would probably produce a different verdict in the event of retrial.[10] Having closely reviewed the record in this case, we find that the defendants have made this showing and, in light of the unique facts of this case, that justice will only be served if the defendants are granted a new trial where a new jury will have the benefit of all of the evidence.
At the hearing on defendants’ second and supplemental motion for new trial, defendants presented, among other things, the testimony of four witnesses concerning two different newly discovered episodes which bear heavily on the credibility of R.P. and A.L., whose testimony comprised the State’s entire case against the defendants. Three individuals — Heather Laurent, Bailey Lombard, and Jordan Ma-gee — testified at the hearing on the new trial motion about a telephone conversation they witnessed in which R.P. admitted she had not been raped. According to Laurent, her male friend, Magee, placed a cellular phone call to R.P. approximately one week after the arrests of defendants. Laurent and another Mend, Lombard, stood next to Magee so they could overhear R.P.’s part of the conversation. When Magee began by stating that he had heard she had been raped, R.P. immediately responded that it was “a big misunderstanding” and then elaborated that:
I was in — what happened was I was in a four wheeler accident. I got bruises. I was someplace I wasn’t supposed to be, *605 and I knew my parents were going to be mad. So when they saw the bruises I 19told them that I was at a party and the guys attacked me because I didn’t want to get — I didn’t want to get in trouble with the four wheeler accident because then they would be really mad. I would be grounded for even longer.
Laurent further testified at the hearing that when Magee pressed R.P. to “speak up because you have got these guys that are in jail for the rest of their lives,” she responded, “I know. I’m going to take care of it.... I made it up, but I’m going to take care of it.” According to Laurent, R.P. then hung up after Magee continued to press her to come forward with the truth. Both Lombard and Magee also testified at the hearing, corroborating Laurent’s account of the conversation.
Cara Strausbaugh also testified about interactions and conversations she had with A.L. when they were both confined in the Florida Parishes Juvenile Detention Center at the end of June and in July 2008.[11] A.L., whom Strausbaugh met for the first time at this detention center, told Strausbaugh that R.P.’s claim she had been raped while A.L. helped defendants hold her down, was completely false, as was her claim that the defendants had beat her with their fists. A.L. informed Straus-baugh that R.P.’s accusations made her furious because she had been in the room at the time, “there wasn’t any sort of fight,” and that R.P. was “making out” with one of the defendants. A.L. further informed Strausbaugh that R.P.’s injuries were the result of a four-wheeler accident and not from a beating administered by defendants.
After a searching review of the record in this case, we are satisfied that this new evidence was discovered after trial and that defense counsel’s failure to discover this evidence was not attributable to any lack of due diligence on their part. Further, given the fact that the State’s entire case against these defendants — each of whom is currently serving a sentence of life in prison based on these | inconvictions — hinged on the ever-changing testimony of R.P. concerning the critical issue of penetration which was eventually corroborated in some respects when A.L. altered her testimony mid-trial, there is no question that this newly discovered evidence undermining both R.P.’s and A.L.’s credibility is material. Although we have recognized that newly discovered evidence affecting only a witness’ credibility “ordinarily will not support a motion for a new trial, because new evidence which is ‘merely cumulative or impeaching’ is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial,”[12] we have also acknowledged that the court possesses the discretion to grant a new trial when the witness’ testimony “is essentially uncorroborated and dispositive of the question of guilt or innocence and it appears that had the impeaching evidence been introduced, it is likely that the jury would have reached a different result.”[13] Under these unique circumstances, we find the trial court erred in failing to grant defendants a new trial given the objectively tenuous credibility of both of these wit *606 nesses — one of whom offered different versions of her story at virtually every juncture of the investigation and prosecution of these defendants and the other who, after receiving transactional immunity from the State, offered two different iterations of her story on successive days of testimony.
The First Circuit clearly erred in subjecting evidence of R.P.’s statements to Magee, as overheard by Laurent and Lombard, to the general rule that recantation of trial testimony must be viewed with the utmost suspicion and that a trial court does not abuse its discretion by denying a motion for a new trial based on such testimony because recantation of trial testimony “is tantamount to an admission of perjury which would destroy the credibility of the witness at a new trial.”[14] In the present case, however, R.P’s conversation with Magee occurred within a week of Indefendants’ arrests — well before trial— and clearly did not amount to an admission she committed perjury in her testimony at a trial that had yet to take place. R.P.’s statements in those conversations that no sexual assault took place and that her injuries stemmed from a four-wheeler accident are not recantations of her trial testimony but the prior inconsistent statements of a declarant who then appeared and testified at trial. Moreover, her statements are not “mere impeachment” evidence although they are admissible as extrinsic evidence attacking the general credibility of the de-clarant.[15] Prior inconsistent statements may constitute substantive non-hearsay evidence admissible for their assertive content when the declarant appears at trial and “there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement.” La.C.E. art. 801(D)(1)(a). In the present case, the testimony of Megan Perkins about the four-wheeler accident that occurred five to six days before the charged incident provided that additional corroboration. So, too, did R.P.’s mother, who testified that her daughter had in fact been grounded at the time of the incident for poor grades in school and that while she had not been expressly prohibited from using the family’s four-wheeler, her use, had they known it, would have angered her parents and led to further discipline.
In this context, we agree with Judge McClendon that the new evidence is not “merely cumulative” or “merely impeaching” of the testimony presented at trial. The expert testimony of Rickies and Dr. Atzemis[16] gave jurors a framework for. assessing whether R.P.’s persistent denials that penetration occurred offered just one more example of a young victim of sexual assault coming to terms with the traumatic events in fits and starts or whether they reflected deeper problems with the credibility of her trial testimony. Their testimony might explain why R.P. 112would omit details, even for as long as a year, but not necessarily why she would claim on more than one occasion that her best friend directly participated in the beating inflicted by defendants by helping to hold her down. Those claims led to the arrest and incarceration of A.L., but at trial, R.P. testified that A.L. was largely indifferent to her entreaties for help because she was in her “own world” clouded by drugs and alcohol, and busy having sex with defendant Ayo. The four-wheeler accident was not simply one more detail omitted from R.P’s slowly unfolding account of that night but substantive evidence, far more powerful than the account offered by Me *607 gan Perkins because it came from the victim herself, that R.P. was describing at trial an event that did not actually happen, or at least did not happen in the way she told jurors.
Further, we agree with Judge McClen-don that Strausbaugh’s account of her conversation with A.L. directly contradicted A.L.’s trial testimony that after R.P.’s pants were removed, “King and Maise were undressed, and ... she could see what appeared to be sexual movements ... [and] that Ayo, at some point, also got between R.P.’s legs.” King, 13-0135 at 6 (McClendon, J., dissenting).
Given the extent to which R.P.’s testimony had already been so undermined by inconsistencies and discrepancies, we find that this evidence is not cumulative and that there is a reasonable probability this evidence would have administered the final and decisive blow to the State’s case and swayed the jury to return different verdicts on one or both counts. Accordingly, we reverse the decisions below, vacate the defendants’ convictions and sentences, and remand these cases to the District Court for a new trial.
REVERSED. CONVICTIONS AND SENTENCES VACATED. REMANDED FOR NEW TRIAL.
WEIMER, J., would grant and docket.
CLARK, J., dissents and would deny writ.
HUGHES, J., dissents and would deny writ.
CRICHTON, J., additionally concurs and assigns reasons.

. State v. Maise, 13-0136 (La.App. 1 Cir. 7/10/14), 2014 WL 3400566 (Pettigrew, McDonald, JJ.; McClendon, J., dissenting); State v. Ward, 13-0137 (La.App. 1 Cir. 7/10/14), 2014 WL 3400567 (Pettigrew, McDonald, JJ.; McClendon, J., dissenting); State v. King, 13-0135 (La.App. 1 Cir. 7/10/14), 2014 WL 3400565 (Pettigrew, McDonald, JJ.; McClendon, J., dissenting); State v. Ayo, 13-0134 (La.App. 1 Cir. 7/10/14), 2014 WL 3400548 (Pettigrew, McDonald, JJ.; McClendon, J., dissenting).

. Search warrants issued to take buccal samples from the defendants for purposes of DNA testing against the bedding recovered from Ward’s bedroom. Subsequent tests revealed the presence of DNA from Ward and Ayo, but none from King, Maise, or R.P.

. Note, the Attorney General’s Office brought the case to trial in the spring of 2012 following recusal of the District Attorney's Office.

. The defendants and A.L. had previously been arrested soon after the incident on warrants issued and executed for the offense of attempted aggravated rape.

. Defendants’ medical expert further testified that the bruising observed on R.P.’s body was more consistent with blunt force trauma as could have occurred in the accident than with a sexual assault.

. The State also presented the expert testimony of JoBeth Rickies and Dr. Adrienne Atzem-is who testified that delayed, piecemeal revelations of sexual abuse are common with younger victims, who usually make their first disclosure to peers instead of to a parent or to the authorities "because they are concerned about getting into trouble, family problems, and embarrassment," and also because they "often consider trying to forget about such events or pretend like they never happened.” According to Rickies, R.P. appeared to fit that pattern: she disclosed the rapes for the first time to Devon Radecker on the night they happened; she then made only the partial disclosure of a beating and attempted rape to her- mother, the authorities, and forensic interviewers, Rickies and Atzemis, eventually adding the detail of attempted oral intercourse; and she finally made full disclosure to her mother, the Attorney General’s Office, and then to jurors at trial. Dr. Atzemis also opined that the bruises on R.P.’s body could *604 have stemmed from blunt force trauma but were more likely caused by a laying-on of hands during a sexual assault.

. King, 13-0135 at 16.

. Id.

. La.Code Crim. P. art. 851(A).

. La.Code Crim. P. art. 851(B)(3); State v. Cavalier, 96-3052, p. 3 (La.10/31/97), 701 So.2d 949, 951.

. A.L. was confined in this facility for three months following her arrest on a warrant was issued and executed for the charge of attempted aggravated rape stemming from R.P.'s now forsaken allegation that A.L. held her down during the incident.

. State v. Cavalier, 96-3052 at 3, 701 So.2d at 951 (quoting Mesarosh v. United States, 352 U.S. 1, 9, 77 S.Ct. 1, 5, 1 L.Ed.2d 1 (1956)).

. Cavalier, 96-3052 at 3-4, 701 So.2d at 951 (internal quotation marks omitted).

. State v. Clayton, 427 So.2d 827, 832-33 (La.1982) (on reh’g).

. La.Code of Evid. art. 607(D)(2).

. See supra note 6.